## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

_____

Miguel Rivera,

   Plaintiff,

   -Against-

Navient Solutions, LLC,

   Defendant.

_____

Index No.:

**COMPLAINT**

**JURY TRIAL DEMANDED**

## PRELIMINARY STATEMENT

1. Plaintiff Miguel Rivera is an indigent borrower of federally insured student loans who was struggling to repay his loans when the events transpired that give rise to this action.

2. Defendant Navient Solutions, LLC ("Navient") is the servicer of the federally insured loans that Mr. Rivera was trying to repay, and, as such, sent monthly billing statements to Mr. Rivera.

3. In these billing statements, Defendant Navient affirmatively misrepresented the amount Mr. Rivera had to repay each month for four straight years, during which time Mr. Rivera overpaid over $1,000 to Defendant.   While making these payments, Mr. Rivera was intermittently homeless and lacked funds

1

for food and other basic needs.   As a result, Mr. Rivera suffered severe financial and emotional distress.

4.      Navient's affirmative misrepresentation occurred when it added a $23.39 late fee to Mr. Rivera's monthly billing statement and misrepresented that it was due, even though Mr. Rivera had no obligation to pay it because he was in a Congressionally mandated repayment plan designed to protect financially distressed student loan borrowers.

5.      Navient's billing statement that Defendant sent to Mr. Rivera was intentionally created to mislead struggling borrowers to pay more than required.

6.      Defendant knew that Mr. Rivera was unlikely to realize that his attempted and unnecessary payments toward the late fee was repeatedly being allocated to interest, and that Mr. Rivera would continue to make such payments towards a debt he could not pay-off in reliance upon Navient's misrepresentations that he must pay the fee.

7.      In fact, Mr. Rivera made this unnecessary payment for almost four years due to Navient's affirmatively misleading billing statements, during which time he was homeless for one year and on Temporary Assistance (welfare) for three years.

8.      Navient knew its monthly billing statements misled struggling

borrowers like Mr. Rivera because numerous complaints on this exact issue have been filed with the Consumer Financial Protection Bureau and the Better Business Bureau.

9.     Mr. Rivera seeks injunctive relief, actual damages, including emotional damages, and reasonable attorney's fees under New York General Business Law § 349 due to Defendant Navient's deceptive conduct that impacts tens of thousands of consumers other than Mr. Rivera.   Mr. Rivera also seeks actual damages, including emotional damages under a common law theory of fraud.

## **PARTIES**

10.     Miguel Rivera is an adult who lives at 3349 Webster Ave., #6K, Bronx, NY 10467.

11.     Defendant Navient Solutions, LLC ("Navient") is the servicer of Mr. Rivera's student loans and engaged in the misconduct described in this action. Navient Solutions, LLC is a Delaware limited liability company with a principal place of business at 2001 Edmund Haley Drive, Reston, VA 20191.

## **JURISDICTION AND VENUE**

12.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because the controversy exceeds $75,000.00 and the parties are diverse in citizenship.

13.     In *Russo v. Navient Solutions, LLC*, 16-cv-0316 (D.C. VT), ECF #54, Defendant Navient Solutions LLC stated that "Navient Corporation, a Delaware Corporation, is the sole member of [Navient Solutions LLC]."

14.     The principal place of business of non-defendant Navient Corporation is 123 Justison Street, Suite 300, Wilmington Delaware, 19801.

15.     This Court has personal jurisdiction over Defendant because Defendant has conducted a substantial amount of the conduct complained of within this district, and because Defendant transacts business within this district.

16.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b) inasmuch as a substantial portion of the unlawful practices giving rise to the claims herein occurred within the Southern District of New York.

## STATUTORY AND DEMOGRAPHIC CONTEXT

### Federally Insured Student Loans

17.     Federally insured student loans are issued either directly from the federal government (the Direct loan program) or, from private banks under the Federal Family Education Loan ("FFEL") program. 20 U.S.C. §1087a et. seq. 20 U.S.C. §§ 1071 et. seq.

18.     Both types of federally insured loans can be subsidized (the government pays interest during certain periods, such as while the borrower is in school) or unsubsidized (the borrower is responsible for interest throughout the life of the loans).

19.     FFEL loans, which are at issue in this law suit, are guaranteed by the federal government.

**Deferments, Forbearances and Income Based Repayment**

20.     Borrowers repaying their student loans can be excused from making a payment if they qualify for a deferment under a strict set of rules, or if they ask for a forbearance, which is given freely but for a limited amount of time during the life of a loan. 34 CFR §§ 682.210, 685.211.

21.     Until 2008, the "economic hardship" deferment and forbearance were the principal methods by which a financially strapped borrower obtained repayment relief.

22.     Both have shortcomings.

23.     The biggest is time.   Economic hardship deferments are limited to a total of three years during the entire life of the loan, while forbearances are generally limited to a total of three years.[1] 34 CFR §§ 682.210(s)(6), 685.211(h)(2)(i).

---

1.     Defendant Navient limits forbearances to 60 months, or five years for FFEL loans.

24.     Moreover, while a forbearance is given for any "acceptable reason," the hardship deferment has a strict eligibility requirement. 34 CFR §§ 682.211(a)(2)(i), 682.210(s)(6)(i-iv).

25.     Further, both require capitalization of unpaid interest when the hardship deferment or forbearance ends.   While interest does not accumulate on a subsidized loan during an economic hardship deferment (because the government pays it) 34 CFR §§ 682.210(a)(3)(i), interest does accumulate on unsubsidized loans during a hardship deferment, as well as both subsidized and unsubsidized loans during a forbearance. 34 CFR §§ 682.211(b)(2).

26.     Because capitalization occurs whenever a forbearances and economic hardship deferment period ends, and such periods are limited to a maximum of 12 months, the outstanding principal of a financially strapped borrower grows quickly. 34 CFR §§ 682.202.(b)(2)(iii) and (iv). Struggling borrowers now must pay interest on capitalized interest, making future repayment even more difficult.

27.     In 2008, Congress added a new repayment option designed to address the shortcomings of forbearance and economic hardship deferment – Income Based Repayment ("IBR"). 20 U.S.C. § 1078(a)(9)(A)(v); 20 U.S.C. § 1098e.

---

*Navient FFELP Student Loan, Repayment Data Package*, p. 19, 44-45 (October 8, 2015), available at https://www.navient.com/assets/about/investors/webcasts/Navient%20FFELP%20Student%20Lo an%20Repayment%20Data%20Package%20Presentation.pdf.

28.     IBR "provide[s] assistance to more borrowers with high levels of debt over a much longer period of limited earnings than the economic hardship deferment" or forbearance.   *Final Regulations to Implement Provisions of the College Cost Reduction and Access Act of 2008*, 73 Fed. Reg. 63232, 63234-5 (October 23, 2008).

29.     IBR was also designed to address Congress' concern that student loan debt was holding back traditionally disadvantaged groups such as women, persons of color, first generation college students, and borrowers from low income families. Susan P. Choy, Xiaojie Li, U.S. Department of Education National Center for Education Statistics, *Dealing with Debt,* at 27 (June 2006) available at https://nces.ed.gov/pubs2006/2006156.pdf.

30.     IBR capitalizes interest less frequently than forbearance or a hardship deferment, thereby reducing borrower debt. 73 Fed. Reg. at *63235.

31.     IBR also can be used for up to 25 years, after which any outstanding balance is forgiven by the government. 20 U.S.C. § 1098e(b)(7).

32.     When Congress enacted IBR, about 79% of borrowers had federally-insured FFEL loans, and hence IBR was made applicable to both FFEL

loans, as well as Direct loans.[2]  Federal Student Aid Portfolio Summary, available at

https://studentaid.gov/data-center/student/portfolio.

## IBR ELIGIBILITY

33.     To be eligible for a reduced IBR payment, the borrower must be

experiencing "partial financial hardship." 20 U.S.C. § 1098e(b)(1); 34 C.F.R. §

682.215(a)(4).

34.     "Partial financial hardship" is defined as paying more than 15% of your

disposable income towards your student loans under the "standard" repayment plan.

20 U.S.C. § 1098e(a)(3); 34 C.F.R. § 682.215(a)(4).

35.     The "Standard" repayment plan fully repays a borrower's loans with

interest over 120 months (ten years). 20 U.S.C. § 1078(a)(9)(A)(i).

36.     Disposable income is determined by the following mathematical

formula:   the borrower's annual adjustable gross income minus ("-") 150% of the

poverty line for borrower's family size = annual disposable income. 20 U.S.C. §

1098e(b)(1); 34 C.F.R. § 682.215 et. seq.

37.     For subsided FFEL loans, Congress pays all accruing interest, which is

not covered by the IBR payment, for three years. 34 C.F.R. § 682.215(b)(4). For

---

2.     In 2010, the FFEL program ended and all federally insured loans were issued as Direct
loans.   Since then, the percentage of outstanding FFEL loans has shrunk to 29% of all
outstanding federally insured loans. Nevertheless, as of the filing of this action, over 12 million
borrowers are still repaying outstanding FFEL loans worth $266 billion.   Federal Student Aid
Portfolio Summary, available at https://studentaid.gov/data-center/student/portfolio.

example, if an IBR monthly payment on a subsidized loan is $50, yet $150 of interest accrued during that period, the FFEL servicer is paid $100 by the federal government to cover the accrued interest.

38.     Unpaid interest that accumulates while the borrower is in IBR does not earn interest. Rather it is capitalized when the borrower exits IBR.

39.     Unpaid late fees (discussed in more depth below) do not earn interest while the borrower is in IBR, nor are they capitalized when the borrower exits IBR. 34 CFR § 682.202(b).

40.     A borrower exits IBR, and accrued interest is capitalized when: a) she no longer has a partial financial hardship, *i.e.* her income is sufficient to fully repay the loan under the standard repayment plan; b) she fails to complete annual recertification requirements regarding income and family size; c) she elects a different payment plan or a forbearance or deferment; or d) she completes 25 years of timely IBR payments whereupon her remaining loan balance is forgiven.

41.     When a loan is forgiven, interest and principal that accumulates on FFEL loans is also paid by the government to the FFEL servicer and FFEL loan holder.   This can occur after the borrower makes 25 years of IBR payments, 20 U.S.C. § 1098e(b)(7); 34 C.F.R. § 682.215(f)(1), but also when a borrower receives a disability discharge. 20 U.S.C. § 1087(a), 34 C.F.R. § 685.213 et. seq.

42.     When a borrower has both subsidized and unsubsidized federally-insured loans, the IBR payment applies to both loans, but the government supplements the accrued interest on only the subsidized loan. Team FFELP IBR Workgroup, *Income-Based Repayment Plan Implementation and Best Practice Guide,* Version 3.0, Question #3, p. 66 (Dec. 2013).   The borrower remains responsible for all interest that accrues on the unsubsidized loan.

43.     If a borrower's income is below 150% of the poverty line for her family size, her disposable earnings are $0.00 and hence her IBR monthly payment for her federally insured loans is $0.00. See 34 C.F.R. § 682.215(b)(1)(iii); see also 34 C.F.R. § 682.215(c)(4).

44.     Congress expressly stated that a borrower of a FFEL loan with a partial financial hardship may elect to have his monthly payment set at the IBR rate, and not a dollar more. 20 U.S.C. § 1098e(b)(1). ("A borrower of any loan made, insured, or guaranteed under part B [the Federal Family Education Loan Program] . . . who has a partial financial hardship . . . , may elect, . . . to have the borrower's aggregate monthly payment for all such loans ***not exceed the result*** [the IBR formula] . . . .) (Emphasis supplied.)

45.     Nothing in the Department of Education's regulations allows the servicer to charge more than what is prescribed under the IBR formula.

46.     This means that a servicer cannot require a borrower to pay a late fee unless his monthly IBR payment is sufficient to cover the accrued interest on the loan.

47.     Borrowers in IBR nevertheless are allowed to make voluntary payments, known as a "pre-payment." 34 C.F.R. § 685.211(a)(2); 34 C.F.R. § 682.215(c)(2). The allocation of pre-payments is discussed in greater detail below.

**Defendant Navient's Substantial FFEL IBR Portfolio**

48.     In 2015, Navient was servicing over 5 million (almost one quarter) of all federally insured loans (both FFEL and Direct) that were in forbearance, deferment or other repayment status.   See *Servicer Portfolio by Loan Status* (March 31, 2015) and *Servicer Portfolio by Repayment Plan* (March 31, 2015) available at https://studentaid.ed.gov/sa/about/data-center/student/portfolio.

49.     On information and belief, in 2015, 40%, (or 2 million) of the loans serviced by Navient were FFEL loans. See *Federal Student Aid Portfolio Summary* available at https://studentaid.ed.gov/sa/about/data-center/student/portfolio.

50.     Further, on information and belief, about 230,000 of the FFEL borrowers serviced by Navient were enrolled in IBR. See *Servicer Portfolio by Repayment Plan* (March 31, 2015) and Federal *Student Aid Portfolio Summary* available at https://studentaid.ed.gov/sa/about/data-center/student/portfolio.

51.     About 50% (110,000) of FFEL borrowers serviced by Navient made

$0.00 IBR payments each month because their incomes were less than 150% of the

poverty guideline, and hence their legally required payment was $0.00. Navient

FFELP Student Loan, Repayment Data Package, p. 28-29 (October 8, 2015),

available at

https://www.navient.com/assets/about/investors/webcasts/Navient%20FFELP%20

Student%20Loan%20Repayment%20Data%20Package%20Presentation.pdf.

52.     Moreover, another 40% (about 90,000) of FFEL borrowers made IBR

payments to Navient that were less than the interest that accrued each month on their

loans. *Id*.

53.     Hence, 90% of FFEL borrowers enrolled in IBR with Navient were

making payments insufficient to cover the interest that accrued each month.

54.     Moreover, federal payments of interest for three years on subsidized

loans did not make-up for the loss of interest income to Navient and its investors.

This is because the majority of FFEL loans in IBR serviced by Navient were

unsubsidized.   Navient FFELP Student Loan, Repayment Data Package, p. 28-29

(October 8, 2015) (44% and 46% of consolidated and subsidized loans "that do not

owe a payment are subsidized loans."   Available at

https://www.navient.com/assets/about/investors/webcasts/Navient%20FFELP%20
Student%20Loan%20Repayment%20Data%20Package%20Presentation.pdf.

55.    On information and belief, by 2015 subsidized payments of interest
from the federal government had ended for a large percentage of the loans that
Navient serviced because the IBR program was now seven (7) years old.

56.    As such, Navient experienced a reduction in the monthly interest
payments it collected from FFEL borrowers enrolled in IBR.

57.    On information and belief, this reduction in interest payments
adversely affected the financial interests of the loan holders of FFEL loans serviced
by Navient.

58.    Indeed, in the 2015 annual report of its parent corporation, Navient
listed "zero monthly payments" by "FFEL" borrowers on IBR as a "risk factor" to
investors. *Navient Corporation*, 2015 Annual Report, 19, dated Dec. 31, 2015,
available at

http://www.annualreports.com/HostedData/AnnualReportArchive/n/NASDAQ_N
AVI_2015.pdf.

59.    Moreover, in 2016, the investment advisor, Moody's, downgraded a
number of Trusts serviced by Navient which contained FFEL loans "due to concerns
that Trust cash flows may not be sufficient."   Navient, 2017 Annual Report, 17,

13

dated Dec. 31, 2017, available at

www.annualreports.com/HostedData/AnnualReportArchive/n/NASDAQ_NAVI_2

017.PDF.

**Late Fees**

60.     The U.S. Department of Education regulates the imposition and

collection of late fees. 34 CFR § 682.202(e); 34 CFR § 682.205(a)(3)(vii).

61.     A servicer may impose a late charge if a payment is received more than

15 days after its due date if the underlying promissory note provides for such. 34

CFR § 682.202(e).

62.     On information and belief, all promissory notes of FFEL loans provide

for a late charge penalty.

63.     The collection of late fees has been an important source of revenue for

Navient and the lenders/trusts that hold such loans.

64.     In a 2009 report to investors, Navient reported that about 1% of its

quarterly interest income was derived from late fees. *See* SLM Student Loan Trust

2007-8, Quarterly Servicing Report, pg. 3, dated October 26, 2009, available at

https://navient.com/assets/about/investors/debtasset/SLM-Loan-Trusts/06-10/2007-

8/0708QT0919C.pdf.

65.     In 2013, Navient was sued by federal regulators for allegedly engineering its payment processing procedures to maximize late fees.   Navient settled the suit for $3 million and refunded $30 million in late fees to borrowers whose loans its serviced.   Federal Deposit Insurance Corporation, *In the Matter of Navient Solutions Inc.*, FDIC 13-0382B, FDIC 13- 0383K, Consent Order, dated May 13, 2014, available at

https://www.fdic.gov/news/news/press/2014/salliemae.pdf.

**The Payment Allocation Methodology for IBR**

66.     As mentioned earlier, borrowers in IBR are allowed to make voluntary payments that exceed what is required of them, known as a "pre-payment." 34 C.F.R. § 682.215(c)(2).

67.     A pre-payment made by a borrower in IBR is allocated in one of two ways.

68.     The first allocation method applies pre-payments to interest, fees, and then principal when the pre-payment is less than 100% of the regular monthly IBR payment or when the IBR payment is $0.00 and the pre-payment exceeds $0.00. 34 C.F.R. § 682.215(c)(3) and (4).

69.     For example, if a borrower with an IBR payment of $50 pays $70, $20 of that payment is the "pre-payment."   Because the $20 pre-payment is less than

100% of the IBR payment ($50), it is allocated first to interest, then late fees, then principal.   34 C.F.R. § 682.215(c)(3).

70.     Similarly, if a borrower's IBR payment is $0.00, but he makes a payment of $20.00 with the intention of paying a late fee, the $20.00 is treated as a pre-payment and applied first to interest, then late fees, then principal. 34 C.F.R. § 682.215(c)(4).

71.     Federal regulations do not provide an opt-out for this first type of payment allocation method for pre-payments. In other words, these types of pre-payments (any additional amount less than 100% of the regular IBR payment or any pre-payment when the IBR payment is $0.00) are always applied to interest first.

72.     This means that if a borrower attempts to pay a late fee under allocation method one, that payment is allocated only to interest and the late fee will go unpaid unless the prepayment first pays off accrued interest.

73.     The second allocation method applies when the pre-payment amount is 100% or more than the IBR payment (e.g. the borrower pays $100 when required to pay only $50).   In that case, the pre-payment is credited towards the following month's payment of interest and principal, and the borrower's next IBR payment is due in two months.   34 C.F.R. § 682.215(c)(3).

74.    In such a scenario, where the borrower makes more than twice his required monthly IBR payment, the pre-payment is applied to principal and interest only and not to any outstanding late fees.

75.    Unlike the first allocation method, the second allocation method, which applies to pre-payments that are 100% or more than the IBR payment, can be overridden by the borrower, for example, to apply to late fees.

76.    The borrower does this by "requesting" the servicer not extend her next due date but instead apply her 100% or more pre-payment to late fees, or principal, or accrued interest. 34 C.F.R. § 682.215(c)(3); § 682.209(b)(2)(ii).

77.    As mentioned earlier, the government pays a FFEL servicer the unpaid interest on a subsidized loan that is in IBR for three years. 34 C.F.R. § 682.215(b)(4).

78.    But if a borrower in IBR with a subsidized loan makes a pre-payment on that loan which is allocated to accrued interest, which would otherwise be covered by a federal subsidy, the government does not ask the FFEL servicer to return its subsidized interest payment.

79.    Rather, the servicer is entitled to retain the full amount of the subsidy. Team FFELP IBR Workgroup, *Income-Based Repayment Plan Implementation and Best Practice Guide,* Version 3.0, p. 10 (Dec. 2013).("A lender need not return to the

federal government any federally paid interest payment received when the borrower with a subsidized loans pays inadvertently or on purpose more than he is required to pay under IBR.")

80.     The pre-payment in such situations involving subsidized loans is allocated just like any other IBR pre-payment; in other words, to interest, then fees, then principal, unless the pre-payment is more than 100% of the IBR payment *and* the borrower elects a different allocation. 34 C.F.R. § 682.215(c)(3) and (4).

**Navient's Monthly Billing Statement**

81.     Navient's monthly billing statement is a three page document. See Mr. Rivera's, redacted, June 30, 2019 statement attached as Exhibit A. The first page contains information on how much the borrower should pay, while the second concerns how previous payments were allocated, and the third page is fine print regarding how payments are allocated, how fees are charged, contact information, etc.

82.     On page one, Navient sets forth an "account summary" containing twelve (12) fields including: "Past Amount Due", "Current Amount Due," "Current Amount Due ( + any past due amount)" and "Unpaid Fees."   These fields are added at the bottom of the account summary and form the "Total Payment Due." *Id.*

83.     The "Total Payment Due" is prominently displayed in three places on the first page of the statement: 1) in the lower middle of the page below the account summary; 2) in the upper-right corner of the statement ("You have $ 23.39 due 07/29/19") and 3) at the bottom of the page in the perforated payment slip that the borrower is supposed to return with his payment. *Id.*

84.     The "Total Payment Due" is also sent in an email entitled "Snapshot of Your Monthly Statement" to those borrowers who elect email delivery of their monthly statement. (A Snapshot email that Mr. Rivera received on July 23, 2015 is also attached at pg. 4 of Exhibit A.)

85.     The Snapshot email "does <u>not</u> include all information from your statement" (emphasis in the original), and hence does not state the "Current Amount Due."

### Navient's Billing Statements Affirmatively Misrepresent the "Total Payment Due" to Many FFEL Recipients on IBR

86.      The "Total Payment Due" affirmatively misrepresents the payment Congress requires the IBR borrower to pay to stay current.

87.     The "Current Amount Due," which constitutes the IBR payment, is the only payment a FFEL borrower in IBR must pay, not any outstanding fees. 20 U.S.C. § 1098e(b)(1)("A borrower of any [FFEL] loan . . . who has a partial financial hardship . . . , may elect, . . . to have the borrower's aggregate monthly

payment for all such loans not exceed the result [of the IBR formula].")(Emphasis supplied.)

88.     The "Current Amount Due" listed in the account summary is overshadowed by the "Total Payment Due" which is written in three different places on the front page of the monthly statement.

89.     The "Total Amount Due" in the perforated payment slip at the bottom of the front page is bolded and in larger type than the "Current Amount Due."

90.     A side by side comparison in the fonts and point type used in the monthly billing statement looks like this: Current  Amount Due: $0.00 **Total Payment Due $23.39.**

91.     Moreover, the amount listed next to the due date in the right hand corner of the statement's front page incorrectly lists the Total Amount Due including the late fee, rather than the Current Amount Due.

**Navient Was Aware that its Monthly Statement Affirmatively Mischaracterized the Amount Due to FFEL Borrowers in IBR Who Owed Late Fees.**

92.     On page three of the monthly statement, Navient states in 8 point type[3] "If you are in an Income Driven Repayment plan . . . . [y]ou are not required to pay more than the present amount due to remain current [on your payments] . . . ."

---

3     The eight point type on Navient's statement reads: You are not required to pay more than the present amount due to remain current during the IDR [Income Driven Repayment] plan.

93.     "Present amount due" is not defined anywhere in the statement.

94.     Further, as described above, the front page of the statement lists "Current Amount Due" and "Total Payment Due," either of which could be construed as the "present amount due."

95.     Nowhere does Navient state that "present amount due" is synonymous with "Current Amount Due." Instead, it has intentionally used two different words (present and current) to mislead borrowers into paying the "Total Payment Due," which phrase, moreover, appears larger and more frequently than "Current Amount Due."

96.     As mentioned, Navient misleadingly highlights "Total Payment Due" by printing it in large bold type on the perforated payment slip and by listing the "Total Payment Due" figure in its "You have $ xx.xx due xx/xx/xx" in the upper right corner of the statements first page.

97.     Navient also knew its monthly statements affirmatively mischaracterized the amount due because of publicly-filed borrower complaints.

98.     For example, an Arizona borrower complained to the Consumer Financial Protection Bureau (CFPB) in April 2016 that Navient added $20 to his IBR payment which he paid because he was not paying attention.   He contacted his previous servicer who said paying the late fee was "optional" and the he was only

required to pay the IBR amount.   The borrower then complained to Navient, but its agent reported Navient's "website would not allow the [late fee and current due] amounts to be separated" from the total payment due.   When the borrower asked Navient to credit his extra payment of $20 towards the late fee, Navient said it could not do it.   Unable to get a resolution, the borrower stopped making payments and incurred more late fees which Navient then added to the "total payment due." See CFPB complaint 1787939, dated February 15, 2016, attached to Exhibit B (Exh. B").

99.     In June 2017, a borrower in Mississippi complained to the CFPB that Navient had added $500 in late fees to his IBR payment of $460 per month.   "So I paid them my entire bonus from work a couple of months ago to clear out the fees. That money was really needed for other things [including medical treatment] but I thought I was doing the right thing   . . . ." His extra payment was applied to future payments, per the second pre-payment methodology described above, not to his late fees.   Consequently he received another statement from Navient asking him again to pay his $500 in late fees along with his monthly IBR payment.   When the borrower asked for an explanation, the Navient agent did not tell him he was only obligated to pay the IBR payment, but instead instructed him to review his payment

history to verify that he had incurred late fees.   See CFPB complaint 2553216,

dated June 19, 2017, attached to Exh. B.

100.   An Illinois borrower complained to the CFPB in December 2017 that

Navient was "disregarding the reduced income based amount and demanding that I

pay the same [late] fees over and over." Navient had billed him an additional $260 in

late fees while he was only required to pay $460 under IBR.   When he complained,

the Navient agent informed him he was *required* to pay the late fees, so he

"reluctantly" did so.   Navient then allocated the late fee payment to interest, and

billed him again for the $260 late fee the following month.   See CFPB complaint

2758771, dated December 18, 2017, attached to Exh. B.

101.   A Texas borrower in May 2018 complained to the CFPB that Navient

sent him a statement indicating the "Total Payment Due" on his IBR that included

late fees.   He paid the late fees but the next bill reflected his extra payment had not

reduced his late fees. By not applying his extra payment to his late fees, Navient

"overbill[ed] for an amount that [was] almost double the monthly payment [required

under IBR]." See CFPB complaint 2911960, dated May 19, 2018, attached to Exh.

B.

102.   A New Jersey borrower in July 2019 complained to the CFPB that

Navient is "misrepresenting the amount I owe on the monthly payment from

{$0.00} to {$12.00}. . . ." He was required to pay $0.00 under IBR, but he paid $12.00 for many months in response to the "Total Payment Due" on his Navient statement. The New Jersey borrower spoke with multiple Navient agents regarding the permanent late fee and was told: a) you only need to pay the IBR payment of $0.00; and b) your past extra payments of $12.00 were applied to interest, not late fees; and c) you cannot pay the late fee until the entire interest balance is paid off. The frustrated borrower wrote "if I do not have to pay the fee . . ., I demand that you stop misleading me by making it 'due' each month."   See CFPB complaint 3322511, dated July 29, 2019, attached to Exh. B.

103.     The CFPB data base, as well as the Better Business Bureau, contain at least ten other complaints, including two from New York, that are similar to the five above.   (Attached as Exh. B).

104.   On information and belief, only a small subset of frustrated borrowers write complaints to the CFPB or other regulators.

105.   On information and belief, many borrowers complain or ask questions to Navient via telephone about its billing practices related to late fees and IBR.

106.   On information and belief, Navient has received multiple written and oral complaints concerning its billing practices related to late fees and IBR.

107.   On information and belief, Navient chose not to address the confusing format of its monthly statements even though it knew that multiple borrowers would mistakenly pay the higher "Total Payment Due," which included late fees, rather than the lower amount they were required to pay under IBR.

108.   On information and belief, Navient knew that borrowers would pay the "Total Payment Due" because: 1) it was written in multiple places, including the front of the statement, the payment slip, and emails, as opposed to the "Current Amount Due," which was only written in one place; and 2) it appeared in big bold type on the payment slip.

109.   On information and belief, Navient knew that borrowers would pay the "Total Payment Due" because payment allocation and repayment plans were too complex for most borrowers to comprehend.

110.   On information and belief, Navient also knew that borrowers would pay the "Total Payment Due" because most borrowers trusted Navient to properly bill them when administering a government-backed loan with numerous, federally-imposed requirements.

111.   In addition, Navient promoted and continues to promote its role as a trusted advisor with expertise, stating on its website:

a.      We are one of a select group of companies chosen to service student and parent federal loans for the U.S. Department of Education.

b.      We are here to help you successfully navigate your student loans.

c.      Watch out for companies that offer "student debt relief." You never have to pay for help.

d.      We maintain a robust, multi-layered compliance management system and thoroughly understand and comply with applicable federal and state laws.

e.      Our mission is to enhance the financial success of our customers [student loan borrowers] by delivering innovative solutions and insights with compassion and personalized service.

f.      Rather than a one-size-fits-all approach, we work to understand details like customers' life stages and the status of their loans. This context helps us determine the right information and resources to highlight at the right times, so customers can make informed decisions.

112.   On information and belief, Navient received a direct benefit when FFEL borrowers mistakenly made payments an excess of their IBR payments, which were then applied to interest.

113.   As discussed above, the government pays a FFEL servicer the unpaid interest on a subsidized IBR loan for three years. 34 C.F.R. § 682.215(b)(4).

26

114.   But if a borrower in IBR with a subsidized loan makes a pre-payment on that loan, which is instead allocated to accrued interest, the government does not ask the FFEL servicer to return the subsidized interest payment.

115.   Rather, the servicer is still entitled to retain the full amount of the subsidy. Team FFELP IBR Workgroup, *Income-Based Repayment Plan Implementation and Best Practice Guide,* Version 3.0, p. 10 (Dec. 2013).("A lender need not return to the federal government any federally paid interest payment received when the borrower with a subsidized loans pays inadvertently or on purpose more than he is required to pay under IBR.")

116.   For unsubsidized loans, the government does not pay anything to the lender if the IBR payment does not cover accrued interest.   Instead, the remaining interest that is not paid by IBR payment accumulates and is capitalized when the borrower exits IBR, which can be in 25 years.

117.   The accumulation of unpaid interest on FFEL loans on IBR that are serviced by Navient is significant.   90% of IBR payments it receives are less than the interest that accrues on the FFEL loans each month.   Navient FFELP Student Loan, Repayment Data Package, p. 28-29 (October 8, 2015), available at https://www.navient.com/assets/about/investors/webcasts/Navient%20FFELP%20Student%20Loan%20Repayment%20Data%20Package%20Presentation.pdf.

27

118.   The pre-payment of subsidized and unsubsidized loans is allocated just like any other IBR pre-payment; in other words, to interest, then fees, then principal, unless the pre-payment is more than 100% of the IBR payment *and* the borrower elects a different allocation. 34 C.F.R. § 682.215(c)(3) and (4).

119.   On information and belief, paid interest is more valuable than unpaid interest that is later capitalized.   This is because the unpaid interest in IBR accumulated without interest and depreciated with time, while paid interest is an immediate financial asset.

120.   On information and belief, tens of thousands of FFEL borrowers in IBR incur late fees that Navient seeks to collect through affirmative misrepresentations of the "Total Payment Due."

121.   On information and belief, tens of thousands of FFEL borrowers are billed erroneously because their "Total Payment Due" (which includes the IBR payment and the late fee) is more than what they are legally required to pay.

122.   On information and belief, Navient agents affirmatively misrepresent how extra payments towards late fees are allocated, misrepresent that payment of late fees is not required, and fail to advise that large extra payments that exceed 100% of the monthly IBR payment can be allocated to late fees if the borrower so chooses.

**The New York Consumer Protection Law**

123.   New York prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state. . . ." N.Y. Gen. Bus. Law §349(a).

124.   An individual "injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions." N.Y. Gen. Bus. Law §349 (h).

125.   Emotional damages and attorney's fees are recoverable under GBL §349.

126.   A GBL §349 damages award may be increased to an amount not to exceed three times the actual damages up to one thousand dollars ($1,000.00), if a court finds the defendant willfully or knowingly violated this section. N.Y. Gen. Bus. Law §349 (h).

## STATEMENT OF FACTS

127.   Miguel Rivera is forty nine years old.

128.   In 1988, Mr. Rivera graduated from high school and enrolled in the University of Connecticut.   During that time, he paid for college with $22,550 in

Stafford loans issued under the FFEL program, as well as by working. Because he was from a poor family, all of his FFEL loans were subsidized, meaning the government paid interest payments to the FFEL lender while he was in school and during other times of financial distress.

129.   In 1994, he graduated and began working.   His wages were low as he worked at two non-profit organizations and also was unemployed for a long stretch of time.   Nevertheless, by 2000 he had managed to pay down about a quarter of his undergraduate debt.

130.   In September 2000, he enrolled in a Master's degree program in Film Production/ Screenwriting at Columbia University.

131.   Mr. Rivera paid for his Master's course through a combination of subsidized and unsubsidized loans and work study.

132.   In 2005, he graduated with more than $100,000 in graduate school debt.

133.   He was not able to find work in the film industry and kept his loans in good standing via a series of hardship deferments and forbearances.

134.   On April 27, 2007, he consolidated his undergraduate and graduate loans with Sallie Mae into two FFEL consolidated loans that are the subject of this action: $62,785 in subsidized Stafford loans, and $63,269 in unsubsidized Stafford loans.

135.   These two loans were then added to a securitized trust or trusts that Defendant Navient services.

136.   From 2007 to 2011, Mr. Rivera worked in a series of administrative assistant jobs for various temp agencies.   These jobs paid from $15 to $20 per hour and were inconsistent.

137.   In January 2011, Mr. Rivera's loan forbearance ended and he entered into a Graduated, Extended Repayment ("Graduated Extended") plan with a 30 year term. 34 C.F.R. §§ 682.209(e)(2)(vi) and (a)(6)(vii). The Graduated Extended plan is provided to borrowers with consolidated loans exceeding $60,000.   The Graduated Extended plan does not take into account the borrower's income.

138.   Mr. Rivera's Graduated Extended payment was $772.54.   Thereafter he made three $772.54 Graduated Extended payments to Navient, as required.

139.   In late May 2011, Mr. Rivera's temp work ended and he again qualified for an economic hardship deferment on his loans, meaning no payment was due.

140.   Wanting to work in his chosen field, and discouraged by the large student loan debt he was unable to repay, Mr. Rivera moved to Los Angeles in 2011.

141.   But Mr. Rivera was unable to find work in the film industry.

142.   In November 2012, Mr. Rivera returned to New York.   His deferment ended in December 2012, but Mr. Rivera was unable to make his next two payments,

for which he incurred two, consecutive, late fee charges of $42.31 (total $84.62). Still facing economic hardship, he applied for and received an economic hardship deferment.

143.   The deferment ended in August 2013, at which time his outstanding interest, but not the $84.62 in late fees, was capitalized.

144.   In August 2013, Mr. Rivera began repaying his loans under the Graduated, Extended Repayment plan.   At this time, he was working at New York University as a salaried administrative assistant.

145.   From August 2013 to August 2014, Mr. Rivera made 13 monthly payments ranging from $634.91 to $804.15.

146.   On information and belief, Navient included the two outstanding late fees (total $84.62) as part of the "Total Payment Due" in its August 2013 monthly statement to Mr. Rivera, which Mr. Rivera paid.

147.   Because he was enrolled in an Graduated, Extended Repayment plan, not an Income Based Repayment plan, federal regulations permitted Defendant Navient to allocate the August 2013 payments first to late fees, then to interest and then to principal. 34 C.F.R. § 682.209(b)(1).   Consequently, the $84.62 in outstanding late fees was immediately paid-off in August 2013.

148.   By the summer of 2014, Mr. Rivera was falling behind on his other bills

due to his student loans.   Indeed, his student loan payment was more than 20% of his take home income.

149.   Mr. Rivera researched his options on the Navient and Federal Student Aid websites and learned about the advantages of the Income Based Repayment ("IBR") Program. Accordingly, Mr. Rivera enrolled in IBR in December 2014. This dropped his monthly payment from $719.53 to $389.83.

150.   In April 2015, Mr. Rivera was laid off from work. Without income, he missed his April IBR payment.

151.   As a result, Navient assessed a single late payment fee of $23.39 for the single missed payment in April 2015.

152.   Because Navient intentionally misrepresented this single late fee of $23.39 as part of the "Total Payment Due" on its billing statements when Mr. Rivera was enrolled in Income Based Repayment, Mr. Rivera mistakenly paid over $1,000 over four years.   The details follow.

153.   Having missed his April 2015 payment, Mr. Rivera called Navient in mid-May 2015 and advised the Navient agent that he had been laid off and wanted an unemployment deferment.   The agent told Mr. Rivera that he needed to request a forbearance (allowing for no payments for three or six or twelve months) because he had used up his three-years-worth of unemployment deferments.

154.   Mr. Rivera did not want a forbearance because he had gleaned from his previous research that, forbearances made repayment longer and more expensive than deferments or Income Based Repayment.   The agent told Mr. Rivera that, if he insisted, he could submit proof of his change in income and have his IBR rate recalculated.

155.   Once Mr. Rivera told Navient he wanted to recalculate his IBR payment, Navient did not require payments on his loans for May and June 2015 while it awaited proof of Mr. Rivera's unemployment benefits income.

156.   Hence, no additional late fees were charged to Mr. Rivera missed his May 2015 and June 2015 payments.

157.   After Mr. Rivera submitted proof of his Unemployment Benefits ("UIB") of $1,822.66 per month, Navient recalculated his IBR rate and sent him an email ("Snapshot Email"), dated July 23, 2015, stating "here is a snapshot of your monthly statement.   'Total Payment Due': $75.70."

158.   The "Total Payment Due" of $75.70 was comprised of the IBR payment of $52.31 (based on his UIB income) and April 2015 late fee of $23.39.

159.   On information and belief, the monthly billing statement for July 2015 that accompanied the Snapshot Email stated in fine print on its reverse side that "If you are in an Income Driven Repayment plan . . . . [y]ou are not required to pay more

than the present amount due . . . ."

160.   Given that Navient was administering a federal relief program for struggling borrowers, Mr. Rivera believed that he could rely on the accuracy of Navient's billing statement and "snapshot of amount due," and therefore he paid the "Total Payment Due" of $75.70 on July 27, 2015.

161.   The additional $23.39 late fee included in the $75.70 payment was allocated by Navient to interest, pursuant to 34 C.F.R. § 682.215(c)(3).

162.   Accordingly, the late fee was not paid-off and reoccurred thereafter as part of the "Total Payment Due" from August 2015 through March 2016.

163.   Believing the "Total Payment Due" was what he was required to pay under IBR, Mr. Rivera paid the demanded amount each month.

164.   By or shortly before August 2015, Mr. Rivera became homeless due to his loss of employment.

165.   In October 2015, Mr. Rivera's unemployment benefit ended and he went on Temporary Assistance ($376 in cash assistance plus $194 in food stamps, monthly).

166.   At this time, he was living in a men's shelter in the Bronx.

167.   Mr. Rivera did not know that he could get his IBR payment reduced to $0.00 now that he was on Temporary Assistance.   Consequently, he continued to

pay what Navient misrepresented as the "Total Payment Due: $75.70."

168.   Needless to say, Mr. Rivera's payment of an extra $23.39 per month that he was not obligated to pay caused considerable hardship.   At the shelter, he shared a kitchen with 10 to15 other men.   Food left in the kitchen and refrigerator was taken, and the kitchen was unclean.

169.   Accordingly, Mr. Rivera ate mostly prepared food from food pantries and delis.

170.   An extra $23.39 would have meant at least two more meals, or clean laundry, or some rodent traps to protect him from the rats and mice that crawled across his blankets at night.

171.   On March 24, 2016, Mr. Rivera completed his annual recertification paperwork for IBR to determine his ongoing IBR payment.   He reported he had no taxable income (Temporary Assistance is not taxable).

172.   Accordingly, Navient sent him a letter on March 25, 2016 stating his new IBR payment was $0.00 per month.

173.   On March 27, 2016, Navient sent Mr. Rivera a monthly statement with a "Total Payment Due" of $23.39.   The statement included an itemized list of how the $23.39 was calculated.   It added the "unpaid fees" of $23.39 to the "Current Amount Due" of $0.00.

36

174.   On or about April 1, 2016, or thereabouts, Mr. Rivera called Navient to ask why he was supposed to pay $23.39 when an earlier letter said his IBR payment was $0.00.   The Navient agent said he was only required to pay the IBR payment of $0.00 and the $23.39 was for late fees.

175.   Mr. Rivera understood what the agent said, but feared that if she was wrong he would lose his IBR eligibility and his payment would go up to an unaffordable level. He also had doubts that the Navient agent was correct given that Navient's billing statement did not say that the "Total Payment Due" was optional.

176.   Fearing a worse outcome than paying $23.39, Mr. Rivera paid the "Total Payment Due."

177.   Pursuant to the IBR allocation rules, 34 C.F.R. § 682.215(c)(4), the $23.39 payment was applied to accrued interest, and not to Mr. Rivera's late fee.

178.   When Mr. Rivera's "Total Payment Due" remained at $23.39 the following month, he assumed it was because he owed a large late fee that he was whittling down each month by $23.39.   He did not understand that his attempted late fee payment was going to interest, not the late fee.   Accordingly, he continued to pay the "Total Payment Due" of $23.39 each month throughout 2016.

179.   After he entered the IBR repayment of $0.00 in March 2016, Mr. Rivera became irregularly employed in a series of Temp jobs.   He did not report his

change of income to Navient, nor was he required to do so until he recertified in January 2017. 34 C.F.R. § 682.215(e)(2)(v).

180.   In late August 2016, Mr. Rivera found an apartment and moved out of the shelter.

181.   In December 2016, Mr. Rivera fell and sustained a compound fracture of his ankle that required surgery and confined him to a wheelchair for seven months. At this time, he could not work.

182.   In late 2016, Navient sent Mr. Rivera a reminder that it was time to recertify for IBR, otherwise his student loan payment would reset to its standard rate of $1,714.68.

183.   Mr. Rivera recertified in January 2017.   On or about January 21, 2017, Navient sent an email stating his IBR rate was $0.00.   However, January 27, 2017 "Snapshot email" reported his "Total Payment Due" to be $23.39.

184.   For a second time Mr. Rivera called Navient to ask about this discrepancy.   The agent informed him that the minimum payment was $0.00 and that the $23.39 was for late fees.

185.   Mr. Rivera was fearful that his IBR payment would reset to the standard payment of $1,714 if he did not pay the "Total Payment Due." He was also distrustful that the agent was correct that he could pay less than the "Total Payment

Due" without consequence.   He believed that Navient's billing statement complied with federal laws designed to protect IBR recipients like him from further financial hardship.

186.   Accordingly, Mr. Rivera continued to pay the "Total Payment Due" of $23.39 every month in 2017, 2018 and through the middle of 2019.

187.   Each payment was allocated to interest and not to the single late fee of $23.39 he incurred in April 2015 when he lost his job.

188.   After his December 2016 fall, Mr. Rivera could not work, has been supported by Temporary Assistance, has relied on home attendants for basic needs, has developed painful scar tissue in his ankle that prevents him from walking without a cane, become profoundly depressed, was treated for suicidal ideation, and applied for Social Security Disability (which was approved retroactively to December 2016 by an Administrative Law Judge in early 2020.)

189.   Navient's requirement that he pay a significant portion of his welfare payment towards his student loan added to Mr. Rivera's depression and subsequent suicidal ideation.

190.   He felt vulnerable and disregarded and worried that Navient would increase his payment significantly if he did not pay $23.39 even when on Temporary Assistance.

191.   He worried that a payment hike could make him homeless again and force him to return to the Men's Shelter.

192.   He worried that he would be required to pay much larger payments to Navient if his income rose that would prevent him from purchasing basic necessities for his home, or ever feeling a modicum of financial security.

193.   Accordingly, for 30 straight months, Mr. Rivera traveled by wheelchair, then walker, then cane to deposit $23.39 into his bank account to pay Navient.

194.   At times, he didn't have the money and had to "borrow" it from friends. This made him feel deeply ashamed, given that he had only a few years previously been earning $50,000 a year at NYU.

195.   At one point, he pawned his only keepsake from his deceased mother – a charm bracelet, to raise the $23.39.

196.   After he pawned it, Mr. Rivera worried that he would not be able to raise the money to get it back, which caused him to ruminate about his plight and feel badly about himself.

197.   Throughout 2017, 2018, and 2019, he postponed buying needed clothing such as underwear and socks so that he could pay Navient.

198.   He postponed buying curtains for his apartment, instead, making do

with a sleeping mask to block out the light.

199.   He did not purchase other items he needed such as dishes, a frying pan, a pot for boiling water, an extra bath towel.

200.   Mr. Rivera lived without other basic items he needed but could not afford, such as a bureau for his clothes, a sofa, or a comfortable bed to sleep on. Instead, his home is furnished with an old bed, and two items he retrieved from the trash – an office chair on wheels and a workbench table.

201.   In 2019, Mr. Rivera sought legal help regarding his Perkins loan that was issued by Columbia University and which is not relevant to this litigation.

202.   He was then advised that Navient had misrepresented the "Total Payment Due."

203.   On information and belief, Mr. Rivera had paid $ 1,099.33 to Navient that he was not required to pay.

204.   He was also advised that his loans were dischargeable due to his disability.

205.   On August 20, 2019, his disability discharge was approved.

206.   On October 7, 2019, Navient was paid in full by the federal government for the outstanding interest and principal.

207.   The only thing that was not paid-off was the outstanding late fee of

$23.39.    Navient waived it.

# CLAIMS FOR RELIEF

## First Cause of Action
## Injunctive Relief under New York's Consumer Protection Law

208.    Plaintiff reasserts and realleges paragraphs 1 to 207 as if fully incorporated herein.

209.    New York prohibits "deceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state . . . ." New York General Business Law § 349(a).

210.    To state a claim for deceptive practices under § 349, Mr. Rivera must show: (1) that the act, practice, or advertisement was consumer-oriented; (2) that the act, practice, or advertisement was misleading in a material respect; and (3) that the plaintiff was injured as a result of the deceptive act, practice, or advertisement.

211.    Defendant Navient "conducted a business" and/or "furnished a service" as those terms are defined in GBL § 349.

212.    Defendant Navient's deceptive acts and practices include the following:

a. Issuing a monthly billing statement to Mr. Rivera that affirmatively misrepresented the amount due in two places next to the words "Total Payment Due" by adding the late fee he did not need to pay.

b. Issuing a monthly email entitled "snapshot of your monthly statement" in which it affirmatively misrepresented the "Total Payment Due" by adding the late fee he did not need to pay.

c. Creating a monthly billing statement where the "Total Payment Due" overshadows the "Current Amount Due" because it is in bold and larger type and is printed on the payment slip that is to accompany a payment.

d. Writing that the borrower in an "income driven repayment plan" is only obligated to pay the "present amount due" in small print on the back of the monthly statement without explaining that "present amount due" is different than "Total Payment Due."

e. Maintaining such billing practices when it knew that 90% of FFEL borrowers in IBR paid less than what accrued in interest each month and therefore were not under any obligation to pay any late fees while in IBR.

213.   Defendant Navient's conduct was "consumer oriented" because it had a broad impact on IBR borrowers with FFEL loans serviced by Navient.

214.   On information and belief, Navient serviced the FFEL loans of over 2 million borrowers in 2015, the same period during which its monthly statements to Mr. Rivera misrepresented the "Total Payment Due.".

215.   On information and belief, these 2 million FFEL borrowers received notices substantially similar to the ones received by Mr. Rivera.

216.   All of these 2 million borrowers, at some point, may have entered IBR.

217.   In addition, in 2015, Navient was servicing about 230,000 FFEL loans being repaid under IBR.   The borrowers of these loans received similar notices to the ones received by Mr. Rivera, and, when late fees were involved, 90% of them received statements that misrepresented the amount due.

218.   Navient's policy also broadly impacted consumers at large given the large number of identical complaints the CFPB and Better Business Bureau received regarding Navient's conduct of adding late fees to IBR payments.

219.   As a result of the affirmative misstatements made in Defendant Navient's monthly billing statement and "snapshot email" a reasonable consumer would have been led to believe, as Ms. Rivera did, that he was required to pay

the "Total Payment Due" even though he was only required to pay the IBR amount due.

220.    Likewise, a reasonable consumer would pay the "Total Payment Due" requested in Navient's monthly statement and email rather than disregard it, even when a Navient agent told the reasonable consumer to ignore it, as happened with Mr. Rivera, because the financial consequences of ignoring the monthly statement appeared dire.

221.    Defendant Navient's affirmative misrepresentations of the Total Payment Due were willful or knowing, as defined under GBL § 349(h).

222.    Defendant Navient knew that the "Total Payment Due" that it demanded Mr. Rivera pay was more than what he was required to pay under IBR.

223.    Defendant Navient likewise knew that its billing statement was deceiving consumers given the numerous inquiries and complaints it received from IBR borrowers, including those complaints filed with the CFPB and Better Business Bureau.

224.    Defendant Navient likewise knew that the vast majority of FFEL borrowers in IBR were exempt from paying late payment fees while in IBR because their IBR payment was less than the monthly interest that accrued each

month on their loans.

225.    Mr. Rivera was injured by Defendant Navient's deceptive statements in that he paid $23.39 every month for 41 months that he was not required to pay and which Navient was not allowed to ask for pursuant to 20 U.S.C. § 1098e(b)(1).

226.    Accordingly, Mr. Rivera seeks to enjoin Defendant from using similar billing practices and billing statements that deceive FFEL borrowers enrolled in IBR.

## Second Cause of Action
## Statutory and Actual Damages under New York's Consumer Protection Law

227.    Plaintiff reasserts and realleges paragraphs 1 to 226 as if fully incorporated herein.

228.    To state a claim under GBL § 349, plaintiff must allege an injury that resulted from the Defendant' deceptive or misleading conduct.

229.    Mr. Rivera was injured financially by Defendant Navient's deceptive statement in that he paid $23.39 every month for 41 months that he was not required to pay and which Navient was not allowed to ask for pursuant 20 U.S.C. § 1098e(b)(1).

230.    In addition, Mr. Rivera is entitled to recover actual damages in

46

the form of emotional damages in excess of $100,000.

231.    Mr. Rivera was on Temporary Assistance almost the entire time
he was making the monthly $23.39 payment that Defendant misrepresented he
was required to make.    That unnecessary payment deprived him of cash
needed for basic necessities such as food, rodent traps, dishes, curtains, towels,
clothing, pots and pans. Lacking such basic necessities caused emotional
damages in that he was unable to fully enjoy his home, feel secure from hunger,
or live a dignified existence.

232.    Mr. Rivera also suffered emotional harm in the form of shame and
embarrassment when he borrowed money from his friends to make the $23.39
payment.

233.    He further suffered emotional harm when he pawned a keepsake
of his mother's to raise funds with which to pay Navient. Mr. Rivera worried
that he would not be able to recover his pawned item that was precious to him.
The act of pawning one of the few possessions his mother left him made him
feel bad about himself and his plight.

234.    Further, Mr. Rivera suffered emotional harm in the form of worsening
depression and suicidal ideation for which he received treatment due to Navient's
demand that he pay a significant portion of his Temporary Assistance and

Unemployment Benefits towards his student loans.   Mr. Rivera worried that

Navient would markedly increase his payment if he failed to pay the $23.39

payment, leading to aggressive debt collector calls, and greater financial difficulties.

235.   Navient's requirement that he pay $23.39 while he was on Temporary

Assistance also caused Mr. Rivera to worry that Navient would always demand

unaffordable payments that kept him in poverty even if he found a job or became

eligible for Social Security.   He feared that such demands for unaffordable

payments would prevent him from paying his rent and lead to homelessness and a

return to the Men's Shelter in the Bronx.

**Third Cause of Action**
**Negligent Misrepresentation**

236.    Plaintiff reasserts and realleges paragraphs 1 to 235 as if fully

incorporated herein.

237.    To state a claim for negligent misrepresentation under New York

law. Mr. Rivera must show: (1) the defendant had a duty, as a result of a special

relationship, to give correct information; (2) the defendant made a false

representation that he or she should have known was incorrect; (3) the

information supplied in the representation was known by the defendant to be

desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely

and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment.

238.    Defendant Navient has a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff.

239.    Navient proclaims in its log-in page that "We are here to help you successfully navigate your student loans."   And "Watch out for companies that offer 'student debt relief.' You never have to pay for help."

240.    Navient is highly regulated by the Department of Education.

241.    It proclaims at the bottom of the page that "WARNING – This system may contain U.S. Government information, which is restricted to authorized users ONLY. Unauthorized access . . . is prohibited and constitutes a violation of Title 18, United States Code, Section 1030, and may subject the individual to criminal and civil penalties."

242.    This explicit relationship with the government creates the impression that Navient knows what it is doing, must comply with high standards prescribed by the government, and that Navient abides by the laws that pertain to student loan servicing.

243.    Indeed, elsewhere in its website it states:

a.  We are one of a select group of companies chosen to service student and parent federal loans for the U.S. Department of Education.

b. We maintain a robust, multi-layered compliance management system and thoroughly understand and comply with applicable federal and state laws.

c. Our mission is to enhance the financial success of our customers [student loan borrowers] by delivering innovative solutions and insights with compassion and personalized service.

d. Rather than a one-size-fits-all approach, we work to understand details like customers' life stages and the status of their loans. This context helps us determine the right information and resources to highlight at the right times, so customers can make informed decisions.

244.   Defendant Navient was aware that the Higher Education Act and its underlying regulations provided no authority for it to add fees onto the prescribed IBR payment Mr. Rivera was entitled to.

245.   Defendant Navient was aware that borrowers enrolled in IBR desire to pay less than before because of financial hardship, and hence would rely on a misrepresentation by Defendant Navient.

246.   Defendant Navient misrepresented the "Total Payment Due" in its monthly statements with the purpose of inducing Mr. Rivera to pay the "Total Payment Due" which exceeded what he was required to pay.

247.   Mr. Rivera justifiably relied upon Navient's statement of the "Total Payment Due" and was injured by this reliance in that he made unnecessary and unaffordable payments to Defendant Navient as a result.

248.   Mr. Rivera reasonable relied on Defendant Navient's misstatement

that he pay the "Total Payment Due."

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

1.      Assume jurisdiction over this matter;

2.      Declare that Defendant violated NY GBL § 349;

3.      Enjoin further illegal conduct under NY GBL § 349;

4.      Award compensatory and statutory damages under NY GBL § 349;

5.      Award attorney's fees under NY GBL § 349;

6.      Find that the Defendant is liable for economic damages caused by their negligent misrepresentations in the amount of $1,099.33.

7.      Find that the Defendant is liable for pain and suffering caused by their negligent misrepresentations in the form of embarrassment, hunger and other financial distress in the amount of $100,000.

8.     And award such other and further relief as this Court deems just and

proper.


Dated:        February 13, 2020
              Brooklyn, New York


                        By:     _____-s-___Johnson M. Tyler
                                JOHNSON M. TYLER
                                Shabnam Faruki
                                Edward Josephson
                                Brooklyn Legal Services
                                105 Court Street
                                Brooklyn, NY 11201
                                Attorneys for Plaintiffs
                                (718) 237-5500