UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  8/19/2020
```

-------------------------------------------------------------------X
                                 :

MIGUEL RIVERA,                           :

                          :

                  Plaintiff,        :

           -v-                  :        20-cv-1284 (LJL)

                          :

NAVIENT SOLUTIONS, LLC,        :        OPINION & ORDER

                          :

                  Defendant.     :

                          :

-------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      Defendant Navient Solutions, LLC ("Navient" or "Defendant") moves, pursuant to Fed.

R. Civ. P. 12(b)(6), to dismiss the complaint against it.  For the reasons below, the motion to

dismiss is granted in part and denied in part.

## BACKGROUND

      The sad events at the heart of this case arise at the intersection of the federal student loan

program and the billing practices of a financial institution that serviced loans made under that

program.  Plaintiff Miguel Rivera ("Rivera" or "Plaintiff") is an indigent borrower of federally

insured student loans.  Dkt. No. 1 ("Complaint" or "Compl.") ¶ 1.[1]  Navient, a servicer of the

federally insured loans, serviced Rivera's student loans.  *Id.* ¶ 2.  Plaintiff's loans were issued by

private banks under the Federal Family Education Loan Program ("FFELP"), 20 U.S.C. § 1087a

*et seq.*, 20 U.S.C. § 1071 *et seq.*, and were governed by regulations issued as part of that

program.[2]

---

[1] The Court accepts the well-pleaded allegations of the Complaint and the documents
incorporated therein as true for purposes of the motion to dismiss.  *See Mills v. Polar Molecular
Corp.*, 12 F.3d 1170, 1174 (2d Cir. 1993).

[2] The FFELP is well described in *Nelson v. Great Lakes Educational Loan Servs, Inc.*, 928 F.3d
639, 642-43 (7th Cir. 2019).

A.      **The Federal Student Loan Program**

Federally insured student loans are issued either directly from the federal government (the direct loan program) or, as in this case, from private banks under the FFELP.  Compl. ¶ 17. Both types of federally insured loans can be subsidized by the government (*i.e.*, the government pays interest during certain periods, such as when the borrower is in school) or unsubsidized (*i.e.*, the borrower is responsible for interest payments throughout the life of the loans).  *Id.* ¶ 18.

There are three ways in which a borrower who has difficulty repaying their student loan can be excused or relieved from making the full payment.  First, the deferment regulations permit a borrower who qualifies under a strict set of rules to defer a payment for up to three years during the entire life of the loan.  *Id.* ¶¶ 20, 23; *see* 34 C.F.R. § 682.210.  Second, a forbearance may be given for any "acceptable reason" and permits a borrower to forbear from making a payment for a total of three years.  Compl. ¶¶ 20, 24; *see* 34 C.F.R. § 682.211.  Both ways require the borrower to pay the interest that has accrued during the time of relief after the period of forbearance or deferment has ended.  Compl. ¶¶ 25-26.  Thus, a borrower who forbears payment or defers an unsubsidized loan due to an economic hardship will be immediately confronted with the obligation to pay that accrued interest when her forbearance or deferment ends, making future repayments more difficult.  *Id.* ¶ 25 (Notably, a borrower who defers a subsidized loan due to economic hardship is not confronted with this accrued interest because the government pays it.)  *Id.*

Third, and in Rivera's case, a borrower may participate in the Income Based Repayment ("IBR") program, which is also referred to by Navient as an Income-Driven Plan ("IDR"). Congress created the program in 2008 to address the limits of forbearance and economic hardship deferment and provide a third option for borrowers struggling to repay their student loans.  *Id.* ¶¶ 27-29.  A borrower qualifies for the program if she is experiencing "partial

financial hardship," meaning that she pays more than 15% of her disposable income towards student loans under the "standard" repayment plan, which gives a borrower ten years to fully repay her loans. *Id.* ¶¶ 33-35; *see* 20 U.S.C. § 1098e(b)(1); 34 C.F.R. § 682.215(a)(4).  To this end, disposable income is defined as the difference between the borrower's annual adjusted gross income and 150% of the poverty line for the borrower's family size.  Compl. ¶ 36; *see* 20 U.S.C. § 1098e(a)(3); 34 C.F.R. § 682.215.  In essence, a borrower who participates in the IBR program elects to have her monthly student loan payment reduced to an amount no greater than 15% of her disposable income.

The IBR has substantial advantages over deferment and forbearance.  Unlike forbearance or deferment, IBR can be used for up to 25 years (after which, if the borrower has made all IBR payments, the government forgives any outstanding balance).  Compl. ¶ 31; *see* 20 U.S.C. § 1098e(b)(7).  Nor does IBR saddle the borrower with as large an accumulated interest payment when she emerges from the plan.  For a period of up to three years, if her IBR payment does not cover all accruing interest on a subsidized loan, the government covers the shortfall, relieving the borrower of the burden of unpaid accrued interest.  Compl. ¶ 37; *see* 34 C.F.R. § 682.215(b)(4).  Although the government will not pay accrued interest on unsubsidized loans, unpaid interest that accumulates while the borrower is in IBR does not earn interest.  Compl. ¶¶ 38, 42.  Thus, the debt burden will be lower than under deferment or forbearance.

As noted, the IBR program has no time limit.  A borrower exits the IBR and accrued interest is capitalized only when: (a) she no longer has a partial financial hardship, *i.e.*, when she has sufficient income to fully repay her loan under the standard repayment plan; (b) she fails to complete annual recertification requirements regarding income and family size; (c) she elects a different payment plan like forbearance or deferment; or (d) she completes 25 years of timely

3

IBR payments whereupon her remaining loan balance is forgiven and the government pays to the FFELP loan servicer or loan holder the interest and principal that has accumulated on the loan. *Id.* ¶¶ 40-41.

The IBR program also allows a borrower to make voluntary payments in excess of her required amount, known as a prepayment. *Id.* ¶¶ 47, 66. Her prepayment can be allocated in two ways, depending on its size. Under the first allocation method, if her prepayment is less than her regular monthly IBR payment, her prepayment is allocated first to interest, then late fees, and finally to principal. *Id.* ¶ 68; *see* 34 C.F.R. § 682.215(c)(3)-(4). Likewise, if her IBR payment is $0.00 and she pays some amount, her prepayment is allocated first to interest, then to late fees, and only finally to principal. The latter provision is particularly salient in this case, so an illustration is merited. If a borrower's payment is $0.00, but she makes a payment of $20.00 in an attempt to pay a late fee, that $20.00 is treated as a prepayment and it would only be applied as desired if she has already paid off all accrued interest. The late fee will go unpaid unless the prepayment first pays off accrued interest. This allotment method cannot be altered. Compl. ¶ 71.

For IBR borrowers with subsidized loans, the foregoing method can lead to a windfall for the servicer and loan holder. A servicer who allocates a prepayment to accrued interest is not required to return the subsidized interest payment for that loan and may retain the full amount of the subsidy. *Id.* ¶¶ 78-79. Thus, the servicer receives double payment—first from the borrower and then from the government. By contrast, the borrower does not benefit from her prepayment, which satisfies interest that the government is also paying on her behalf.

The second allocation method applies only when a borrower's prepayment equals or exceeds that of her regular monthly IBR payment; in such a case, the prepayment is credited

towards the next payment of interest and principal (but not to late fees), and her next IBR payment is due in two months.  Compl. ¶ 73; *see* 34 C.F.R. § 682.215(c)(3).  This allotment method *can* be overridden by the borrower (and, for example, put the prepayment towards late fees), by "requesting" that the servicer not extend her next due date but instead apply the prepayment to late fees, or principal, or accrued interest.  Compl. ¶ 75.

**B.      Navient's Billing Practices**

Navient is a large servicer of federally insured loans.

Its monthly billing statement is a three-page document.  The billing statement sent to Rivera for the month of June 2019 is representative.  *See* Compl., Ex. A.  The first page contains information on how much the borrower should pay.  In particular, that page sets forth a twelve-field account summary with fields for "Past Amount Due," "Current Amount Due (+ any past due amount)," "Unpaid Fees," and "Total Payment Due."   It is displayed as follows:



As shown, the first page also has a window in the upper right corner which discusses how to make a payment conveniently and indicates the amount due.  It states: "You have $[23.39] due [07/26/19]".  At the bottom of the page is a perforated payment slip to be detached and included with a payment.  It states in large bold type: "Total Payment Due: $[23.39]" without stating any other amounts.

*Id.* at 1.

The second page contains tables for "Loan Information" as of the billing date, with lines for the current balance including unpaid interest, unpaid fees, and unpaid principal; a "Billing Period Summary" that indicates payments received and how the last payment was applied (including whether applied to interest, to fees, or to principal); and "Loan Details." *Id.* at 2.  At the bottom of the box for "Loan Details," the second page on Rivera's billing statement states that the "Total Payment Due" and "Unpaid Fees" are $23.39.  It also lists $0.00 for "Current Amount Due" and "Past Due Amount."



*Id.*

The third page contains the fine print including information about how payments are allocated, the answers to frequently asked questions, and important disclosures.  Pertinent to this case, Navient states in 8-point type: "If you are on an Income-Driven Repayment (IDR) plan . . . [y]ou are not required to pay more than the present amount due to remain current during the IDR plan." *Id.* at 3.  "Present amount due" is not defined anywhere in the statement.



*Id.*

Navient also enclosed the "Total Payment Due" in a "snapshot" email providing a "snapshot of your monthly statement" to borrowers who elected email delivery of their monthly statement. *Id.* at 4-5. The email disclaims that it "does not include all information from your statement." *Id.* It does not state the "Current Amount Due."

## C.     Miguel Rivera's Case

Rivera is 49 years old. Compl. ¶ 127. He attended the University of Connecticut from 1988 to 1994 and paid for his education with Stafford loans issued under the FFELP, as well as by working. *Id.* ¶ 128. His undergraduate loans totaled $22,550 and were subsidized, meaning that the government paid interest payments to the FFELP lender when he was in school, and thereafter when he experienced periods of economic hardship. *Id.* By 2000, after working at two non-profit organizations and enduring a stint of unemployment, he nonetheless managed to pay down about a quarter of his undergraduate debt. *Id.* ¶ 129. In September of that same year, he enrolled in a Master's degree program in Film Production/Screenwriting at Columbia

University.  *Id.* ¶ 130.  He paid his tuition with a combination of subsidized loans, unsubsidized loans, and work-study.  *Id.* ¶ 131.  He graduated from Columbia University in 2005, with more than $100,000 in graduate school debt.  *Id.* ¶ 132.  He was not able to find work in the film industry; in the meantime, he kept his loans in good standing by a series of hardship deferments and forbearances.  *Id.* ¶ 133.  He also worked in a series of administrative assistant jobs for various temp agencies from 2007 to 2011.  *Id.* ¶ 136.

On April 27, 2007, Rivera consolidated his undergraduate and graduate loans with Sallie Mae into two FFELP consolidated loans: $62,785 in subsidized Stafford loans and $63,269 in unsubsidized Stafford loans.  *Id.* ¶ 134.  These were then added to a securities trust serviced by Navient.  *Id.* ¶ 135.  Rivera was able to forbear loan payments until January 2011.  *Id.* ¶ 137.  He then entered into a "Graduated, Extended Repayment" plan that had a 30-year term and that did not consider the borrower's income. Under the plan, Rivera was required to make monthly payments of $772.54.  *Id.* ¶ 138.  He did so for three months until his temp work ended in May 2011.  *Id.* ¶ 139.  Unemployed, he again qualified for an economic hardship deferment on his loans, and was able to defer payments until December 2012.  *Id.* ¶¶ 139, 142.  He then missed two payments and incurred two consecutive late fee charges of $42.31 (totaling $84.62).  *Id.* ¶ 142.  Still facing economic hardship, he applied for and received another economic hardship deferment which ended in August 2013.  *Id.* ¶¶ 142-43.  At that time, his outstanding interest, but not the $84.62 in late fees, was capitalized.  *Id.* ¶ 143.  He made his monthly payments over the ensuing year until August 2014, and satisfied the two outstanding late fees.  *Id.* ¶¶ 145-47.

By the summer of 2014, however, Rivera's loan payment was more than 20% of his take-home income and he was falling behind on his other bills.  *Id.* ¶ 148.  Rivera enrolled in IBR in December 2014, which dropped his monthly payment from $719.53 to $389.83.  *Id.*

¶ 149.  However, in April 2015, he lost employment and missed his April payment.  He was assessed a late payment fee of $23.39.  *Id.* ¶¶ 150-51.  Rivera submitted proof of his unemployment benefits, which reduced his IBR monthly payment to $52.31.  *Id.* ¶ 158.

When his unemployment benefits expired in October 2015, Rivera began receiving temporary assistance and lived in a men's shelter in the Bronx.  *Id.* ¶¶ 165-66.  Unaware that as someone on temporary assistance, he could reduce his IBR payment to $0.00, he did not ask Navient to recalculate his IBR rate, which remained $52.31.  *Id.* ¶ 167.  In March 2016, when Rivera filed his annual IBR recertification paperwork to determine his ongoing IBR monthly payment amount, he reported he had no taxable income, and Navient informed Rivera that his new IBR monthly payment was $0.00, where it remained until his disability discharge was approved in August 2019.  *Id.* ¶¶ 172, 179, 181, 205.  Months later, on October 7, 2019, the government paid Navient in full for Rivera's outstanding interest and principal.  *Id.* ¶ 206.

From July 2015 until March 2016, however, Rivera had consistently received billing statements from Navient that reflected a "Total Payment Due" in excess of his IBR payment that was due.  The difference reflected a single late fee of $23.39 that Rivera incurred in April 2015, the month he lost employment.[3]  The "Total Payment Due" was listed as $75.70, which consisted of his IBR payment of $52.31 listed as "Current Amount Due" and the April 2015 late fee of $23.39 listed as "Unpaid Fee."  *Id.* ¶ 157-59.[4]  However, only the IBR payment of $52.31 was

---

[3] When Rivera lost his job in April 2015 and missed his April IBR payment, he spoke with Navient, which told him to request a forbearance because he had used up his three years of unemployment deferments.  After expressing that he did not want a forbearance, the Navient agent allowed him to submit proof of his change in income and have his IBR rate recalculated.  While it awaited proof of Rivera's income from unemployment benefits, Navient did not require Rivera to make payments for May and June 2015 and thus it did not charge additional late fees for those months.  Compl. ¶¶ 153-56.
[4] In contrast to the billing statements, the monthly snapshot emails only displayed the "Total Payment Due" amount in the body of the email.  Compl., Ex. A at 4-5.

actually due.  When Rivera paid the full amount of $75.70, Navient allocated the additional

$23.39 late fee to interest and thus the late fee was not paid off.  *Id.* ¶ 161.  The late fee

continued to recur as part of the "Total Payment Due" from August 2015 through March 2016.

*Id.* ¶ 162.

Once Rivera's monthly IBR statements were reduced to $0 in March 2016, Navient still

carried over his $23.39 unpaid fee from April 2015, and charged Rivera a "Total Payment Due"

of $23.39.  *Id.* ¶ 173.  From then until the government paid Rivera's loan in full in October 2019,

Navient sent to Rivera monthly billing statements and snapshot emails that continued to report a

"Total Payment Due" of $23.39, which was $23.39 over the IBR payment of $0, *i.e.*, the

maximum amount Navient was permitted to charge Rivera and the only amount he was required

to pay.  Fearful that his IBR payment would be reset to the standard payment of $1,714 if he did

not pay the amount Navient requested, Rivera did as Navient directed.  *Id.* ¶ 176.  However,

because of the peculiar features of the IBR allocation methodologies set forth above, Navient

continued to apply Rivera's excess payments or prepayments to accrued interest that Rivera was

not required to pay and for which he received no benefit.  Navient did not apply his excess

payments to unpaid fees.  Thus, every month, in a scene reminiscent of Groundhog Day, the

$23.39 reappeared and Rivera paid it.

In April 2016, Rivera called Navient to ask why he had received a bill with the "Total

Payment Due" of $23.39 when his IBR payment had been adjusted to $0.00.  The Navient agent

responded that Rivera was required only to pay the IBR payment of $0.00 and that the charge of

$23.39 was for late fees.  Rivera doubted the Navient agent given that the billing statement did

not say that "Total Payment Due" was optional, and he also feared that he would lose his IBR

eligibility or have his payments increase if he did not make the payment.  *Id.* ¶¶ 174-75.  Rivera

called Navient again in January 2017 when he saw a "Total Payment Due" of $23.39 after his IBR was recertified to equal $0.00.  The Navient agent told him the same thing and he had the same concerns.  *Id.* ¶¶ 183-84.  Rivera continued to pay the "Total Payment Due" on the billing statements, trusting the statements rather than the telephonic advice from the Navient agent. Finally, in 2019, Rivera sought legal help regarding a loan issued by Columbia University.  It was then that he was advised that Navient had misrepresented the "Total Payment Due."  *Id.* ¶¶ 201-02.

In total, Rivera paid $1,099.33 to Navient that he was not required to pay.  *Id.* ¶ 203; *see also* Dkt. No. 41 at 4.  In December 2016, Rivera fell and sustained a compound fracture of his ankle that required surgery and confined him to a wheelchair for seven months, then required him to use a walker, and now a cane.  Compl. ¶ 188.  For 30 months, he traveled by wheelchair, then by walker, and then by cane, to deposit the $23.39 to his bank account to pay Navient. During that same time period, in order to make his payments, he borrowed from friends, pawned his only keepsake from his deceased mother, and postponed buying needed clothing and other essential goods.  He ceased making the payments only shortly before his disability discharge was approved in December 2016, when he sought help regarding the unrelated loan from Columbia University and was advised that he did not have to pay the "Total Payment Due."  *Id.* ¶¶ 201-02.

D.     **Alleged Related Complaints Against Navient**

Plaintiff alleges that tens of thousands of FFELP borrowers in the IBR program incur late fees that Navient collects by affirmatively misrepresenting their "Total Payment Due."  It highlights a few complaints made to the Consumer Finance Protection Board ("CFPB").

In April 2016, an Arizona borrower complained to the CFPB that Navient had added $20 to his IBR payment that he paid because he was not paying attention.  *Id.* ¶ 98.  In June 2017, a Mississippi borrower complained to the CFPB that Navient had added $500 in late fees to his

IBR payment of $460 per month, which he paid.  *Id.* ¶ 99.  In December 2017, an Illinois borrower complained to the CFPB that Navient was disregarding the IBR amount and demanding that he pay the same late fees over and over.  *Id.* ¶ 100.  In May 2018, a Texas borrower complained to the CFPB that Navient had sent him a statement indicating the "Total Payment Due "on his IBR that included late fees.  *Id.* ¶ 101.  In July 2019, a New Jersey borrower complained to the CFPB that Navient misrepresented the amount he owed on his monthly statement by including the late fee amount in the "Total Payment Due."  *Id.* ¶ 102.

In each instance, the borrower allegedly paid the full "Total Payment Due" intending to satisfy the late fee, only to have the late fee recur because of the FFELP's allocation rules.  *Id.* ¶¶ 98-102.[5]

Plaintiff further alleges that in each instance, Navient received a benefit from the borrower because FFELP rules permit a servicer to keep the government's payment of interest on a subsidized IBR loan, even if the borrower has made a prepayment allocated to accrued interest. Thus, the servicer is, in effect, paid twice for the accrued interest.  Moreover, although the government does not pay the servicer if the IBR payment does not cover accrued interest on an unsubsidized loan, Navient still benefits from prepayments allocated to accrued interest that were meant to satisfy the late fee: unpaid interest in IBR accumulates without interest, while paid interest is an immediate financial asset that earns interest or generates cash flow in the hands of the servicer.  These benefits are important to Navient.  The accumulation of unpaid interest on FFELP IBR loans that Navient services is significant.  Ninety percent of IBR payments Navient receives are less than the interest that accrues on those loans each month.  *Id.* ¶ 27.

---

[5] Plaintiff alleges that the CFPB database, as well as the Better Business Bureau, contain at least ten other complaints, including two from New York, that are similar.  Compl. ¶ 103.

E.      **The Parties' Contentions**

Rivera claims that Navient engaged in consumer fraud and negligent misrepresentation, by repeatedly reporting a "Total Payment Due" comprised of unpaid fees that, when he received the billing statements, he was not required to pay.  He acknowledges the billing statements he received contained a line for "Current Amount Due" that did not include the $23.39 in unpaid fees, and that their fine print stated, "If you are on an Income-Driven Repayment (IDR) plan . . . [y]ou are not required to pay more than the present amount due to remain current during the IDR plan."  *Id.* ¶ 92; *id.*, Ex. A at 3.  But, he contends, the line for "Current Amount Due" alongside that for "Total Payment Due" was misleading.  He argues that a reasonable borrower reading the billing statement would understand that the "Total Payment Due" was what the borrower was required to pay regardless of what the billing statement said with respect to "Current Amount Due," and that understanding would be reinforced by the two other places on the first page of the billing statement that referenced—in bold and large letters—the "Total Payment Due" without mentioning "Current Amount Due."  As to the fine print, Rivera makes three points: (1) the language was in 8-point print on the third page; (2) "present amount due," listed only in the fine print, is not defined anywhere in the billing statement; and (3) "present amount due" and "Current Amount Due" are not reported in the monthly snapshot emails at all.[6]

Rivera also acknowledges the two calls he had with the call center, in 2016 and 2017, in which he was told that he was only required to pay the IBR payment of $0.00 and not the $23.39 for late fees.  *Id.* ¶¶ 174-74, 183-84.  But, he claims he did not credit what he was told over the

---

[6] Plaintiff explains that the "Current Amount Due" constitutes the IBR payment, Compl. ¶ 87, and later alleges that Navient deliberately used "present" and "current" interchangeably to mislead borrowers, *id.* ¶ 95.  To that end, Plaintiff also notes that the descriptors were used on different pages: "current" on the first page of the billing statement and "present" on the third.  *Id.* ¶ 94.

telephone because the more official billing statements continued to tell him that the late fees were included in the payment due.

Rivera underscores that Navient had a powerful financial motive to deceive him and others who were in the IBR program independent of its relationship with the government. Plaintiff alleges that Navient received multiple written and oral complaints about its billing practices related to late fees and IBR, but neglected to correct its formatting because the servicer benefitted more from borrowers' paid interest on FFELP loans than their unpaid interest later capitalized. He reasons that, whereas unpaid interest in IBR accumulated without interest and depreciated with time, paid interest is an immediate financial asset. *Id.* ¶ 119.

## LEGAL STANDARD

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plaintiffs must allege sufficient facts to "nudge[ ] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. Although the Court must accept all the factual allegations of a complaint as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). The issue "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 235-36 (1974)).

## DISCUSSION

### A.    Damages Under N.Y. Gen. Bus. Law Section 349

Section 349 of the New York General Business Law ("N.Y. G.B.L.") states as the law of New York in seemingly unambiguous terms: "Deceptive acts or practice in the conduct of any

business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."  N.Y. G.B.L. § 349(a).  As originally enacted, the law provided a cause of action only to the New York Attorney General.  It was amended in 1980 to provide a private right of action. As amended, it now also provides that "any person who has been injured by reason of any violation of [N.Y. G.B.L. § 349] may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions."  N.Y. G.B.L. § 349(h).[7]

To state a claim under Section 349, "a [private] plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice."  *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015) (quoting *Koch v. Acker, Merrell & Condit Co.*, 18 N.Y.3d 940 (2012)); *accord Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000).  "[A]n action under § 349 is not subject to the pleading-with-particularity requirements of Rule 9(b), but need only meet the bare-bones pleading requirements of Rule 8(a)."  *Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005) (internal citations omitted).

Although a private plaintiff need not plead or allege reliance under Section 349, *see In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 409 (S.D.N.Y. 2015) (stating Section 349 does not require proof of reliance); *Stutman v. Chem Bank*, 95 N.Y.2d 24, 25 (2000) ("[R]eliance is not an element of a section 349 claim"), she is required to show that the material deceptive act caused the injury.  *See Small v. Lorillard Tobacco Co.*, 94 N.Y.2d 43, 56 (2013) ("[P]roof that a material

---

[7] Under Section 349(h), "[t]he court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the defendant willfully or knowingly violated this section."  N.Y. G.B.L. § 349(h).  In addition, "[t]he court may award reasonable attorney's fees to a prevailing plaintiff."  *Id.*

deceptive act or practice caused actual, although not necessarily pecuniary, harm is required to impose compensatory damages.") (citation and internal quotation marks omitted); *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 26 (1995) ("[W]hile the statute does not require proof of justifiable reliance, a plaintiff seeking compensatory damages must show that the defendant engaged in a material deceptive act or practice that caused actual, although not necessarily pecuniary harm.").

In determining whether an act is "materially misleading," the reasonable consumer is not held to the same standard as a lawyer trained to make fine distinctions reading a bond indenture or a regulation.  The relevant question is whether the language is "likely to mislead a reasonable consumer acting reasonably under the circumstances."  *Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 116 (2d Cir. 2007) (quoting *Oswego Laborers' Local 214 Pension Fund*, 85 N.Y.2d at 26); *see also Orlander*, 802 F.3d at 300; *Duran v. Henkel of Am.*, 2020 WL 1503456, at *4 (S.D.N.Y. Mar. 30, 2020).  Moreover, a determination of whether a particular act or practice is misleading is not ordinarily appropriate for decision on a motion to dismiss.  *See Duran*, 2020 WL 1503456, at *4 ("While it is possible for a court to decide this question as a matter of law, this inquiry is generally a question of fact not suited for resolution at the motion to dismiss stage.").[8]

---

[8] *See also Eidelman v. Sun Prod. Corp.*, 2017 WL 4277187, at *3 (S.D.N.Y. Sept. 25, 2017) ("Generally, this inquiry is not appropriate on a motion to dismiss."); *Silva v. Smucker Nat. Foods, Inc.*, 2015 WL 5360022, at *10 (E.D.N.Y. Sept. 14, 2015) ("What a reasonable consumer's interpretation of a seller's representation might be generally an issue of fact that is not appropriate for decision on a motion to dismiss. I cannot say as a matter of law at this early stage of the case that a reasonable consumer could not interpret [defendant's] representations to be a factual claim about [the product's] ingredients.") (internal citation omitted); *Segedie v. Hain Celestial Grp., Inc.*, 2015 WL 2168374, at *10 (S.D.N.Y. May 7, 2015) ("Whether a reasonable consumer would be deceived by a product label is generally a question of fact not amenable to determination on a motion to dismiss.") (citation omitted); *Verizon Directories Corp. v. Yellow Book USA, Inc.*, 309 F. Supp. 2d 401, 407 (E.D.N.Y. 2004) (noting, in reference to a Lanham

The Court cannot conclude here, as a matter of law, that Navient's language would *not* be misleading to a reasonable consumer.  First, the email Rivera received regarding his monthly billing statement and that contained the "snapshot of [his] monthly statement" referred alone and in isolation to the "Total Payment Due."  It did not mention a current amount due.  A snapshot is commonly understood in a consumer context, however, to mean a summary of the most important items of what is being snapshot.  It is a synopsis, meaning a "brief summary or outline of main points."  Black's Law Dictionary Online, https://thelawdictionary.org/synopsis/ (last visited August 19, 2020).  A reasonable consumer thus could be excused in understanding that when the snapshot of a billing statement lists a payment due (and no other amount), that the payment due (and not any other amount) is what she must pay attention to in the attached billing statement.

Moreover, the first page of the billing statement would only reinforce and not dispel the reasonable consumer from believing that the amount she is required to pay is the total payment due.  In the first place, the billing statement uses the language "Total Payment Due," and not some other language such as the amount outstanding on a prior loan.  But, "payment" is commonly understood as "an amount of money that is paid for something."  Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/payment (last visited August 19, 2020); *see also* Black's Law Dictionary (11th ed. 2019) ("The act of paying or being paid"; "To give money for a good or service that one buys.").  And, while "due" has several different definitions, one of them, even to a lawyer, is that it is payable or, in other words, "the time for

---

Act claim, that "[a] federal trial judge, with a background and experience unlike that of most consumers, is hardly in a position to declare" that reasonable consumers would not be misled, and indicating that resolution of the issue may require "surveys, expert testimony, and other evidence of what is happening in the real world").

payment of it has arrived."  Black's Law Dictionary Online, https://thelawdictionary.org/due/ (last visited August 19, 2020); *see* Black's Law Dictionary (11th ed. 2019) ("Immediately enforceable."); Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/due (last visited August 19, 2020) ("[H]aving reached the date at which payment is required.").  And, as Plaintiff emphasizes, the word "total" is defined as "constituting the whole."  Dkt. No. 14 at 9 (quoting American Heritage Dictionary (4th ed. 2001)); *see* Black's Law Dictionary (11th ed. 2019) ("Whole; not divided; full; complete"; "Utter; absolute."); Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/total (last visited August 17, 2020) ("[C]omprising or constituting a whole.").

It thus certainly would not be unreasonable or patently implausible for a consumer, reading the language "Total Payment Due," to understand that the figure reflected after that constituted the whole amount of payment the consumer was required to make.  *See Eidelman*, 2017 WL 4277187, at *4 ("[W]hether an interpretation is unreasonable as a matter of law is generally reached at this stage only where, for instance, a plaintiff's claims as to the impressions that a reasonable consumer might draw are 'patently implausible' or unrealistic."); *Stoltz v. Fage Dairy Processing Indus., S.A.*, 2015 WL 5579872, at *20 (E.D.N.Y. Sept. 22, 2015) (noting the [pending] case "d[id] not present *the type of patently implausible claim that warrants dismissal as a matter of law* based on the reasonable consumer prong") (emphasis added).

Such a consumer would not be disabused of his understanding by the line preceding the "Total Payment Due," in the detail of the first page that refers to the "Current Amount Due." The first page of the billing statement prominently contains the figure from the "Total Payment Due" (and not the current amount) in a window in the upper right corner that informs the borrower how much she has due on the due date alongside information on how to make a

payment conveniently.  The plain message is that the full amount is due on that due date.  It also lists the figure from the "Total Payment Due" (and not the current amount) following the language for "Total Payment Due," which is in large bold type, on the perforated payment slip to be detached and included with a payment.  The tear sheet does not refer to the current amount due.  Compl., Ex. A at 1.  It is not at all self-evident that the "Total Payment Due" is something other than the total payment that is due and that the borrower is required to make.

Indeed, the "Current Amount Due" is reflected as the sum of the interest and principal payment that is due for the relevant period.  *Id.*  Thus, a consumer reading the snapshot and first page of the billing statement could well understand that what was reflected in "Current Amount Due" was the amount that had accrued as a result of current activity (*i.e.*, the loan being outstanding for an additional month), and that it did not relieve the borrower from paying off the late fee that had accrued and was owing from earlier periods.  *See Rozier v. Fin. Recovery Sys., Inc.*, 2011 WL 2295116, at *3, 5 (E.D.N.Y. June 7, 2011) (finding that "instead of providing the consumer with the actual amount due," the "language used would cause a reasonable consumer to be unclear about both the amount of debt owed and whether the consumer would incur unspecified, additional charges on the debt").

Under some circumstances, "the presence of a disclaimer or similar clarifying language may defeat a claim of deception."  *Fink v. Time Warner Cable*, 714 F.3d 739, 742 (2d Cir. 2013).  However, those circumstances do not exist here.

Defendant points to two places on the three-page billing statement where it claims that the reference to "Total Payment Due" and the indication of how much must be paid is clarified: language in the fine print on the second page that indicates that the borrower must pay the "Past Due Amount . . . to avoid a Late Fee," and language in the fine print of the third page that

indicates what must be paid by borrowers on IBR plans.  Neither of these disclosures is sufficient, however, as a matter of law to permit Navient to avoid liability.

In the first place, based on Plaintiff's allegations, there would be no reason for a reasonable consumer "to look beyond misleading representations on the front" of the billing statement to discover the "truth" from the fine print in the remainder of the billing statement. *Mantikas v. Kellogg Co.*, 910 F.3d 633, 637 (2d Cir. 2020).  Both from the language on the first page of the billing statement and from the way in which billing statements are configured, a reasonable consumer would not expect the fine print on the remainder of those pages to do anything other than confirm, rather than contradict, the representations on the first page.  *Id.*

Moreover, if a consumer were confused by the language in the snapshot emails and on the first page of the billing statement, the language on the second and third pages of the billing statement would not necessarily dispel the confusion.  The language to which Navient refers on the second page of the billing statement refers to the "Loan Details" and comes after the "Loan Information" (as of the billing date) and the "Billing Period Summary" (for the prior period).  Compl., Ex. A at 2.  On its face, it does not purport to be a statement of the total amount the borrower must pay in response to the billing statement.  Consistent with the box being a summary of the "Loan Details," it has lines for the "Loan Date," the "Loan Program," the "Interest Rate," whether the interest rate is fixed or variable, and the "Total Payment Due."  It is only at the bottom of the box, after Navient sets forth the "Past Due Amount," the "Current Amount Due," and the amount of "Unpaid Fees," that the billing statement indicates that only the "Past Due Amount" must be paid within a few weeks and the "Current Amount + Any Past Due Amount" must both be paid by a later date "to avoid a Late Fee."

Thus, even on its face and even assuming the (dubious) proposition that a reasonable consumer would be required as a matter of law to look through all of the language regarding "Loan Details" to understand what she has to pay in response to a billing statement, the language would only indicate what must be paid to avoid a late fee and not what must be paid to be compliant with the terms of the loan (and with the borrower's IDR plan). *See, e.g.*, *Goldemberg v. Johnson & Johnson Consumer Cos., Inc.,* 8 F. Supp. 3d 467, 479-80 (S.D.N.Y. Mar. 27, 2014) (holding that where defendant's trademark and advertising "exclusively tout[ed]" natural ingredients in its "Active Naturals" personal care products, the disclosure of synthetic ingredients on the back label did not as a matter of law prevent a reasonable consumer from being misled); *In re Frito-Lay N. Am., Inc. All Nat. Litig.*, 2013 WL 4647512, at *16 (E.D.N.Y. Aug. 29, 2013) (despite "surrounding language that gave context to the label's center pronouncement," the court could not "hold as a matter of law that . . . no reasonable consumer would be deceived"); *Ackerman v. Coca-Cola Co.,* 2010 WL 2925955, at *15 (E.D.N.Y. July 21, 2010) ("[T]he presence of a nutritional panel, though relevant, does not as a matter of law extinguish the possibility that reasonable consumers could be misled by [defendant]'s labeling and marketing."). Furthermore, factors such as "font size, placement, or emphasis of a disclaimer can be relevant to whether the terms and conditions were in fact fully disclosed." *Delgado v. Ocwen Loan Servicing, LLC*, 2014 WL 4773991, at *8 (E.D.N.Y. Sept. 24, 2014); *see Lonner v. Simon Prop. Grp, Inc.*, 866 N.Y.S.3d 239, 247 (2d Dep't 2008) (holding that "the inadequate font size in which the dormancy fee provision was printed, and the defendant's concomitant failure to conspicuously disclose that provision," constituted a deceptive business practice" for purposes of Section 349).

The third page of the billing statement contains the language: "You are not required to pay more than the present amount due to remain current during the IDR plan."  Compl., Ex. A at 3.  But a reasonable consumer would not necessarily consult that language if the language on the first page were confusing.  In the first place, there are two columns with information on the third page, each of which contains over 70 lines of text.  The language to which Navient refers is in the first column, at the end of the fourth paragraph answering the question: "How do you allocate my payment across my loans on this statement?"  *Id.*  It would not be self-evident to a reasonable consumer confused by how much she had to pay that the obvious place to look was in the fine print on how the payment she was required to make would be allocated.  If she paid the full "Total Payment Due," which included the amount for late fees, and nothing more, she would not necessarily think that there was an issue of allocation at all.  She could reasonably believe that the payment would be allocated based on the categories that made up the "Total Payment Due"—to any interest or principal owed with respect to the current period and to late fees and to nothing more or less.  Nor, indeed, if she thought to read through all the fine print on the third page, would she necessarily understand that she had to pay only the "Current Amount Due" as reflected on the first page of the billing statement as opposed to the "Total Payment Due."  That is because the fine print uses the language "present amount due," and not current amount due.  It thus begs the question, and does not answer it, whether the present amount due is the "Total Payment Due" or the "Current Amount Due."

Next, Navient relies on the two telephone calls that Rivera himself made to the call center in which he admits he was told that he did not need to pay the total amount due.  Navient argues that "Plaintiff's entire case hinges on his claim that he was deceived into paying the Fee" and that he cannot prevail on that claim because he was provided information in the telephone calls

22

"that he was not required to pay the Fee and that any payments would be applied to outstanding interest."  Dkt. No. 11 at 18.  In its reply, Navient recasts the argument: "[T]he Court must take into account the 'entire mosaic' of the relationship and not just view 'each tile separately.'"  Dkt. No. 15 at 4 (quoting *Davis v. Hain Celestial Group, Inc.*, 297 F. Supp. 3d 327, 338 (E.D.N.Y. 2018)).  As alleged, Rivera continued to pay the "Total Payment Due" because—even after having the calls—the billing statements included the late fee in that amount, and Rivera credited the billing statement and not the call with the call center operators.

Navient's argument is not sufficient to defeat Rivera's claim as a matter of law.  A Section 349 claim asks whether the language on the billing statement would have been confusing or misleading to a reasonable consumer, and not to the plaintiff before the Court based on his or her own idiosyncratic facts.  *See Orlander*, 802 F.3d at 300.  The test is objective.  The question thus is not whether the language would have been confusing or misleading to Rivera personally after he had the call center operators.  And, as noted above, reliance is not an element of a Section 349 claim.  Navient's argument goes, if at all, to the issue of whether Navient's false and misleading statement caused Rivera's injury, entitling him to recover for the payments.  It does not go to whether Navient made a false and misleading statement in the billing statement itself.

It therefore is not surprising that the single case Navient makes to support its argument is not apposite.  In *Davis*, a consumer alleged he was deceived into believing that a juice was predominantly made of beet juice because the front label of the product listed its ingredients in order as "beet, apple, carrot, lemon, ginger" and "raw," and the beverage itself was red.  297 F. Supp. 3d at 331.  Meanwhile, the side label listed the ingredients, in order of weight, as "organic apple, organic carrot, organic beet, filtered water, organic lemon and organic gender," *id.*, making clear that beet was not the predominant ingredient.  Looking at the label as a whole, the

court rejected that claim and granted defendant's motion to dismiss.  It held: "If a plaintiff alleges that an element of a product's label is misleading, but another portion of the label would dispel the confusion, the court should ask whether the misleading element is ambiguous.  If so, the clarification can defeat the claim.  This is because reasonable consumers understand that, with vague product descriptions, 'the devil is in the details.'"  *Id.* at 334 (citation omitted).  The court thus ruled that plaintiff's allegations failed to state a claim for relief: "Consumers are accustomed to seeing a product's ingredients listed by weight under the nutrition facts—as they are here.  The ingredient lists thus clarify—in exactly the spot consumers are trained to look— that the premium ingredients are not the most predominant ingredients.  No reasonable consumer could have been misled in light of this clarifying language."  *Id.* at 337.

*Davis* provides no support to Navient's argument.  In *Davis*, it was critical that the allegedly misleading statement was ambiguous and that the clarifying language was on another portion of the same label in exactly the spot that consumers are trained to look.  The case is based on the general proposition that "an allegedly misleading statement must be viewed 'in light of its context on the product label or advertisement as a whole.'"  *Mantikas*, 910 F.3d at 633 (citation omitted).  It does not support the proposition for which Navient cites it (and which finds no support in the law) that a reasonable consumer confronted with a misleading advertisement would be expected to go beyond the advertisement as a whole and contact a call center, or that a defendant can publish a false or misleading advertisement and escape liability under Section 349 so long as the misstatement is corrected by a call center operator for those few who are lucky or shrewd enough to call and ask for clarification.[9]

---

[9] The remainder of the cases Navient relies upon each are easily distinguishable.  In *Fermin v. Pfizer Inc.*, 215 F. Supp. 3d 209 (E.D.N.Y. 2016), plaintiffs claimed that the size of defendant's pill containers deceived them as to the number of pills they would receive.  But, the court found,

Finally, relying on *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380 (1947), Navient argues that Rivera should not be able to recover against it because the regulatory language of 34 C.F.R. § 682.215(b)(1)(iii) specified how much a borrower on an IBR plan was required to pay and "the appearance of rules and regulations in the Federal Register gives legal notice of their contents." *Id.* at 385. *Merrill*, however, was a lawsuit against a wholly government-owned enterprise seeking recovery from the government under a government insurance program. The Supreme Court, in that context, held that the insurance available from the government could not be expanded based on an alleged misrepresentation by a government agent. It reasoned, "[i]f the Federal Crop Insurance Act had by explicit language prohibited the insurance [at issue], the ignorance of such . . . recovery could not be had against the [c]orporation for [the] loss." *Id.* at 384. It made no difference that the prohibition was contained in a regulation and not in a statute.

*Merrill* did not purport to define for purposes of New York law the expectations and obligations of a reasonable consumer. Nor has Navient cited to any case under Section 349 that

---

"each of the packages in Plaintiffs' Complaint clearly display[ed] the total pill-count on the label" and "the tablet count [was] clearly and prominently displayed on each of the labels" and was "unambiguous." *Id.* at 211-12. Because it would be "impossible to view the products without also reading the total number of pills contained in each package," the court held that the complaint failed the "reasonable consumer" test. *Id.* at 212. *La Vigne v. Costco Wholesale Corp.*, 284 F. Supp. 3d 496 (S.D.N.Y. 2018) raised the question—rejected by other courts—of whether it was reasonable for consumers to expect that they are purchasing a certain amount of product solely because of the size of its packaging. It held, in line with the decisions of those other courts, that it was not, particularly given that "the front of each can of Kirkland Canned Chicken [was] labeled to clearly indicate that it contains canned chicken 'packed in water'" and "[t]he label also display[ed] the net weight per can of the enclosed product." *Id.* at 513. In *Lokai Holdings LLC v. Twin Tiger USA LLC*, 306 F. Supp. 3d 629, 641 (S.D.N.Y. 2018), the allegedly misleading statement that a bracelet contained water from Mt. Everest was both ambiguous on its face as to whether it would always retain that water and was clarified by a disclaimer on the very same website that the water may evaporate over time. Finally, *Broder v MBNA Corp.*, 722 N.Y.S.2d 524, 526 (1st Dep't 2001) upheld a decision denying a motion for summary judgment on a Section 349 claim, ruling that the question of whether the disclosure was misleading raised a question of fact.

would require a reasonable consumer confronted with misleading language to consult 34 C.F.R.

§ 682.215—which contains seven subsections and is seven pages long—to understand her

obligations.[10]  In *Merrill* itself, the Supreme Court assumed that if the misrepresentation at issue

had been made by a private insurance company, and not a government corporation, "recovery

could be had."  332 U.S. at 383.  Plaintiff has pleaded a false and misleading consumer

statement.  The Code of Federal Regulations does not deprive him of the right to try to prove his

case.

## B.     Injunctive Relief Under N.Y. Gen. Bus. Law Section 349

Navient argues that Rivera's first cause of action, for injunctive relief, should be

dismissed because he alleges no ongoing injury, he has an adequate remedy at law, and he does

not plead a sufficient basis for any injunctive relief.  Dkt No. 11 at 13.  That motion is granted.

A plaintiff must demonstrate standing "for each claim and form of relief

sought."  *Buonasera v. Honest Co., Inc.*, 208 F. Supp. 3d 555, 564 (S.D.N.Y. 2016).  To satisfy

the requirements of standing under Article III of the Constitution, a plaintiff must establish three

elements: "(1) the plaintiff must have suffered an injury in fact, *i.e.*, an invasion of a legally

---

[10] Navient relies on *Milich v. State Farm Fire & Cas. Co.*, 513 F. App'x 97 (2d Cir. 2013), which required disclosure language that explicitly incorporated and directed the reader to the language of state law.  The plaintiff was the policy holder of an insurance policy that extended workers compensation coverage for injuries sustained by a covered residence employee, which was defined as an employee who was both engaged in regular employment of less than 40 hours per work *and* "defined under the New York Workers Compensation Law as an employee for whom workers compensation benefits must be provided."  *Id.* at 98.  The insured submitted a claim for a domestic employee who worked fewer than 40 hours per week but that claim was denied because under the New York Worker Compensation Law, an employer need not provide workers compensation benefits to domestic employees who work less than 40 hours per week.  The court rejected plaintiff's claim that the endorsement was misleading because the policy "clearly" "incorporate[d] into the definition of residence employee the terms of the New York statute" and "[a] policyholder who declines to read the readily accessible provisions referred to cannot claim to have been misled."  *Id.* at 99.  Here, by contrast, the billing statement purported to be an all-inclusive statement of Rivera's obligations and did not refer him to the provisions of the federal regulations as the language that was binding on him with respect to his loan obligations.

protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the injury and the conduct complained of; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 688 (2d Cir. 2013) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992)).  Moreover, to demonstrate an injury in fact when seeking injunctive relief, "a plaintiff cannot rely on a past injury alone," *Buonasera*, 208 F. Supp. 3d at 564, but must establish "a 'real or immediate threat' of injury," *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 101, 111-12 (1983)).  "The Supreme Court has repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient."  *Daniel v. Tootsie Roll Indus., LLC*, 2018 WL 3650015, at *6 (S.D.N.Y. Aug. 1, 2018) (quoting *Am. Civil Liberties Union v. Clapper*, 785 F.3d 787, 800 (2d Cir. 2015)).

These same standards apply to injunctive actions in federal courts under Section 349. *See, e.g.*, *Izquerdo v. Panera Breads Co.*, 2020 1503557, at *3 (S.D.N.Y. Mar. 30, 2020); *Duran*, 2020 WL 1503456, at *12; *Yee Ting Lau v. Pret A Manger (USA) Ltd.*, 2018 WL 4682014, at *2 (S.D.N.Y. Sept. 28, 2018) (citing *Kommer v. Bayer Consumer Health*, 710 F. App'x 43, 44 (2d Cir. 2018)); *see also In re Amla Litig.*, 320 F. Supp. 3d 578, 593 (S.D.N.Y. 2018) (plaintiffs lacked standing to seek injunctive relief under Section 349 where they "adduce[d] no evidence that they are likely to repurchase the product, and indeed allege[d] that they would not have purchased the product in the first place had they known of its alleged defects").

In *Berni v. Barilla S.p.A.*, 964 F.3d 141 (2d Cir. 2020), the Second Circuit was confronted with the question of whether certification of a Rule 23(b)(2) class action for

injunctive relief was appropriate on behalf of a group of past purchasers of a product who claimed that they were misled by the defendant's advertising.  The Second Circuit held that it was not.  In so doing, it confronted directly the question presented here: whether a past purchaser who claims that she was misled into buying a product by a misleading advertisement can obtain injunctive relief restraining the defendant from continuing to engage in its illegal conduct.  The Second Circuit held that the past purchaser could not obtain such injunctive relief.  It is worth quoting its reasoning at length:

> Our analysis starts with the familiar principle that injunctive relief is only proper when a plaintiff, lacking an adequate remedy at law, is likely to suffer from injury at the hands of the defendant if the court does not act in equity.  The prospective-orientation of the analysis is critical: to maintain an action for injunctive relief, a plaintiff 'cannot rely on past injury . . . but must show a likelihood that he . . . will be injured in the future. If the injury occurred in the past . . . then plaintiffs will lack the kind of injury necessary to sustain a case or controversy, and necessary to establish standing, under Article III.
> . . . .
> [P]ast purchasers of a consumer product who claim to be deceived by that product's packaging—like the purchasers of Barilla pasta here—have, at most, alleged a past harm.
> . . . .
> For several reasons, past purchasers of a product, like the Barilla purchasers, are not likely to encounter future harm of the kind that makes injunctive relief appropriate.  In the first place, past purchasers are not bound to purchaser a product again—meaning that once they become aware they have been deceived, that will often be the last time they will buy that item.
> . . . .
> But even if they do purchase it again, there is no reason to believed that all, or even most, of the class members will incur a harm new. Supposing that they have been deceived by the product's packaging once, they will not again be under the illusion that the boxes of the newer pasta are filled in the same way as the boxes of the older pasta. Instead, next time they buy one of the newer pastas, they will be doing so with exactly the level of information that they claim they were owed from the beginning.

*Id.* at 146-49 (internal citations omitted).[11]

---

[11] The Second Circuit explicitly rejected the reasoning of the cases upon which Plaintiff relies, including *In re Amlat Litig.*, 282 F. Supp. 3d 751, 769 (S.D.N.Y. 2017), *Ackerman*, 2013 WL

*Berni* is dispositive here.  Based on Plaintiff's own allegations, his loans were discharged and Navient is no longer servicing them.  By 2019, even before the loans were discharged, he was informed—and believed—that notwithstanding the language on Navient's bills, he did not have to pay more than the IBR amount and, specifically, did not have to pay the late fee amount. *See* Compl. ¶ 174.  He alleges that he was misled by the language on the Navient billing statement.  Even if he became a debtor again on a student loan serviced by Navient, there is no reason to believe he will be under the same illusion again.

## C.      Negligent Misrepresentation

In his third cause of action, Plaintiff alleges Navient is liable for negligent misrepresentation as a result of the alleged false and misleading statements on its billing statements.  Navient argues that, even if its billing statements contained misleading representations, it cannot be held liable in negligence because, as the servicer on behalf of the lender of a loan extended to Plaintiff, it owed Plaintiff no duties enforceable for negligent misrepresentation.

Plaintiff relies on statements made by Navient on its public-facing website:

- We are one of a select group of companies chosen to service student and parent federal loans for the U.S. Department of Education.

- We are here to help you successfully navigate your student loans.

- Watch out for companies that offer "student debt relief." You never have to pay for help.

- We maintain a robust, multi-layered compliance management system and thoroughly understand and comply with applicable federal and state laws.

---

7044866, at *17, and *Belfiore v. Procter & Gamble Co.*, 311 F.R.D. 29, 67 (E.D.N.Y. 2015). *See Berni*, 964 F.3d at 148 nn.30 & 32.

- Our mission is to enhance the financial success of our customers [student loan borrowers] by delivering innovative solutions and insights with compassion and personalized service.

- Rather than a one-size-fits-all approach, we work to understand details like customers' life stages and the status of their loans.  This context helps us determine the right information and resources to highlight at the right times, so customers can make informed decisions.

Compl. ¶¶ 111, 239.

 "Under New York law, the elements of a negligent misrepresentation claim are that (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known as incorrect; (3) the information supplied in the representations was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff relied on it to his or her detriment."  *Hydro Inv'rs, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000).

The case law is clear in this District that the relationship between a borrower and the company that services a student loan is not sufficient to support a cause of action for negligent misrepresentation under New York law.  *See Hyland v. Navient Corp.*, 2019 WL 2918238, at *11 (S.D.N.Y. July 8, 2019); *Genna v. Sallie Mae, Inc.*, 2012 WL 1339482 at *5 (S.D.N.Y. April 17, 2012)  ("[T]he case law is sufficiently clear and consistent that in New York "an arm's length borrower-lender relationship . . . does not support a cause of action for negligent misrepresentation'") (quoting *Dobroshi v. Bank of Am., N.A.*, 886 N.Y.S.2d 106, 109 (1st Dep't 2009)).[12]

_____

[12] The only two cases cited by Plaintiff in which negligent misrepresentation claims were adequately pled are distinguishable.  *See Daniel v. Navient Solutions*, *LLC*, 328 F. Supp. 3d 1319 (M.D. Fla. 2018) (claim under Florida law); *Olsen v. Nelnet, Inc.*, 392 F. Supp. 3d 1006 (D. Neb. 2019) (claim under Nebraska law; no discussion of existence of duty).

In *Hyland*, Judge Cote set forth the applicable principles in rejecting a similar claim of negligent misrepresentation for failure to plead that Navient, as servicer, owed any duties to the plaintiff.  Judge Cote reasoned: "The general rule is that a lender does not owe tort duties to a borrower. Courts applying New York, Florida, California, and Maryland law have applied that rule to both lenders and loan servicers."  2019 WL 2918238, at *11 (internal citations omitted). Although Navient had "made representations on its public-facing website about the quality of its customer service," "[t]hese representations d[id] not establish that Navient has undertaken a fiduciary duty to act or give advice for the benefit of its borrowers."  *Id.*

The relationship between Navient and Rivera here is materially indistinguishable from that in *Hyland*.  This cause of action therefore is dismissed with prejudice.

## CONCLUSION

Defendant's motion to dismiss the second cause of action is DENIED.  Defendant's motion to dismiss the first and third causes of action is GRANTED WITH PREJUDICE.

A status conference is scheduled for September 18, 2020 at 10:30 a.m.  One week prior to conference, the parties shall jointly submit to the Court a proposed Case Management Plan and Scheduling Order.

The Clerk of Court is respectfully directed to close Dkt. No. 9.


SO ORDERED.

Dated: August 19, 2020
      New York, New York
                                          LEWIS J. LIMAN
                                 United States District Judge